# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JACOB A. CRUMPLEY,

      **Plaintiff,**

v.                                                                  Case No. 16-2298-DDC

**ASSOCIATED WHOLESALE**
**GROCERS, et al.,**

      **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff Jacob Crumpley has a seizure disorder. He alleges that defendants Associated

Wholesale Grocers ("AWG") and Clarence M. Kelley and Associates, Inc. ("CMKA") took

adverse employment actions against him because of his seizure disorder and thus violated the

Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA"). Specifically,

plaintiff alleges that defendants discriminated against him because of his seizure disorder and

retaliated against him for opposing the discrimination practiced against him.

This matter is before the court on four motions. Plaintiff has filed two motions—a

Motion to Exclude Certain Opinion Testimony of Dr. Jeffery Kaplan and Dr. Michael Seeley

(Doc. 177) and a Motion for Partial Summary Judgment (Doc. 175). And each defendant has

filed a Motion for Summary Judgment (Docs. 179 & 181).

In his motions, plaintiff seeks to exclude certain opinion testimony by Dr. Jeffery Kaplan

and Dr. Michael Seeley—two of his treating neurologists. In a separate Motion for Partial

Summary Judgment, plaintiff argues that his seizure disorder, as a matter of law, is a "disability"

as the ADA defines that term.

Both defendants argue that they are entitled to summary judgment against all plaintiff's claims because he has failed, as a matter of law, to establish discrimination or retaliation. AWG also argues that it was not plaintiff's employer and the court thus cannot hold it liable on plaintiff's claims.

Because the court's ruling on plaintiff's Motion to Exclude Certain Testimony affects the facts comprising the summary judgment facts, the court begins with that motion. For the reasons discussed below, the court grants in part and denies in part plaintiff's Motion to Exclude Certain Testimony.

## I.    Plaintiff's Motion to Exclude Certain Opinion Testimony of Dr. Jeffery Kaplan and Dr. Michael Seeley (Doc. 177)

### A.    Background

Both Dr. Jeffery Kaplan and Dr. Michael Seeley are board-certified neurologists. Dr. Kaplan has been practicing neurology since 1991. Dr. Seeley has been practicing neurology since 1995. Individually, they have treated hundreds of patients with seizure disorders.

Plaintiff has a seizure disorder. Generally, this disorder causes him to experience seizures every three to six months. During past seizures, plaintiff has been unconscious for as long as 45 seconds. He characterizes the period after unconsciousness as "coming to," and he explained that it can take him up to five minutes to "come around." Doc. 183-2 at 4 (Crumpley Dep. 10:1–6). Sometimes, plaintiff does not sense any warning that he is about to experience a seizure.

Both Dr. Kaplan and Dr. Seeley have treated plaintiff for his seizure disorder. They treated him before, but not during, the period at issue in this lawsuit. During the treatment for his seizure condition, plaintiff's treating neurologists warned him about standard seizure precautions. These precautions warned that he should not drive a vehicle, work at certain

heights, or work alone or be alone for extended periods of time during the six months after a seizure. The neurologists explained that people are more likely to have another seizure during the six months after a seizure. So, these precautions were designed to decrease plaintiff's risk of serious, adverse events that another seizure might pose. Because of the seriousness of the risk, driving within six months after a seizure is one of the most important precautions.

Plaintiff agrees that it is dangerous for him to drive a car in the six months after he has had a seizure. He understands he might crash the car and hurt himself or others. But plaintiff did not comply with the directives from his physicians against driving a vehicle because he needed to work and had no other way to get to work.

Both Dr. Kaplan and Dr. Seeley advised plaintiff of their understandings of the Kansas and Missouri vehicle laws governing a person who experiences seizures. Specifically, Dr. Seeley told plaintiff about the seizure precautions, including no driving within six months, and he even displays posters in his office about the illegality of driving in both Kansas and Missouri. Dr. Kaplan strictly cautioned plaintiff that it was illegal to drive during the six months after a seizure, and that he could "seriously hurt or even kill someone if he were to have an episode or seizure while driving." Doc. 180-3 at 9 (Kaplan Dep. 51:23–52:5).

Dr. Kaplan opined that plaintiff should not drive at all unless he has seizure surgery and is seizure-free for two years. He also opined that during the six months after a seizure, plaintiff should not pursue employment where driving and working alone are conditions of employment.

Dr. Michael Ferguson, plaintiff's primary care physician, also treated plaintiff. Dr. Ferguson is not a neurologist and he lacks any specialized training in neurology. Dr. Ferguson opined that a neurologist should provide seizure precautions, and specifically, those precautions

should warn about driving a motor vehicle. On one occasion, Dr. Ferguson told plaintiff he should not drive until he was cleared to do so by a neurologist.

Plaintiff experienced a seizure on January 14, 2014, meaning his six-month seizure precautions last until July 14, 2014.

On January 16, 2017, plaintiff disclosed Dr. Ferguson as a non-retained expert in this case. *See* Doc. 66. On April 3, 2017, both CMKA and AWG disclosed Dr. Kaplan and Dr. Seeley as non-retained experts. *See* Docs. 97, 98 & 178-2.

Plaintiff seeks to exclude certain testimony by Drs. Kaplan and Seeley. Specifically, he seeks to exclude both neurologists from opining[1] on the following topics:

1. "[T]he effect of Plaintiff's seizure disorder on Plaintiff's qualification for employment with CMKA and other employers, [and] his ability to perform job duties at CMKA or other employers . . . ." Doc. 97 at 2 & 3.

2. "[T]he law in Kansas and Missouri on whether individuals with seizure disorders may operate a motor vehicle after experiencing a seizure . . . ." Doc. 178-2 at 1 & 2.

Plaintiff also seeks to exclude other opinions that the neurologists expressed in their depositions. Namely, plaintiff seeks to exclude the following opinions by Dr. Kaplan:

3. CMKA's Counsel: And if Mr. Crumpley was seeking employment that required driving a vehicle or working—well, let's take it one at a time. If he was seeking employment within the six months after January 14, 2014, where that job required him to operate a motor vehicle it would be your expectation that he would disclose his seizure disorder to his employer because of the driving requirement; correct?

   Dr. Kaplan: Yes.

---

[1] To simplify things, the remainder of this Order refers to the challenged opinions by the numbers 1–6 as summarized in the discussion following this footnote. So, for example, "[T]he effect of Plaintiff's seizure disorder on Plaintiff's qualification for employment with CMKA and other employers, [and] his ability to perform job duties at CMKA or other employers . . . ." is called the "first opinion," and so on.

> CMKA's Counsel:  And same question with respect to working alone, if he was seeking employment with an employer who was offering him a job where he would be working alone you would expect him to disclose his seizure condition to that employer in those circumstances; true?
>
> Dr. Kaplan:  Yes.
>
> Doc. 178-3 at 2 (Kaplan Dep. 56:10–57:1).

4.     CMKA's Counsel:  And if Mr. Crumpley was pursuing employment where driving was a condition of the employment it would be your opinion to him that he should not undertake that employment if he was within six months of a seizure; correct?

> Dr. Kaplan:  Yes.
>
> CMKA's Counsel:  And the same question I suppose as to a job that may involve him working by himself without anyone else around, if he were to seek that type of employment within the six-month window after a seizure it would be your opinion that he should not pursue that employment because of the danger to him—himself in that case?
>
> Dr. Kaplan:  Yes.
>
> *Id.* at 1–2 (Kaplan Dep. 52:17–53:5).

And the following specific testimony from Dr. Seeley:

5.     AWG's Counsel:  So assuming all of that to be true and that one of his job duties involved driving a car, based on what you knew of his epilepsy and the fact that he had breakthrough seizures, I think reported in the medical records every three to four months, is that a job that you would have told him he was medically qualified to perform?

> [objection omitted]
>
> Dr. Seeley:  If he was—I would not recommend operating a motor vehicle if it was—if he was not six months seizure free.
>
> Doc. 178-4 at 1 (Seeley Dep. 50:13–51:2).

6.     AWG's Counsel:  If Mr. Crumpley was offered a position within two months of experiencing a seizure and he understood that one of his job duties was to drive a car, would you expect that he would volunteer that he had a seizure disorder?

[objection omitted]

Dr. Seeley:  I have no idea what he would do.

AWG's Counsel:  Let me ask you a different question. Would you advise him that he should let his employer know that he was not medically able to drive a car or shouldn't be driving a car because he had had a seizure within the past six year -- six months?

[objection omitted]

Dr. Seeley: I would advise him that he should definitely let his employer know if he—if he is going to operate a motor vehicle, he should let his employer know that he has—has had seizures.

*Id.* at 1–2 (Seeley Dep. 52:6–53:1).

## B.    Analysis

Plaintiff argues that the court should exclude Drs. Kaplan and Seeley's testimony because it is inadmissible under Fed. R. Evid. 702 and the rubric inspired by *Daubert*.[2]  Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The Supreme Court has described the trial judge's role under Rule 702 in this fashion:

Faced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or

---

[2]    *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

methodology properly can be applied to the facts in issue. *Daubert*, 509 U.S. at 592–93.  In short, federal trial judges must function as gatekeepers and ensure that "'an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert*, 509 U.S. at 597).  To determine expert testimony's reliability, the trial court may use the *Daubert* factors. In summary form, they ask the following questions:

> (1) Has the theory or technique been tested (or can it be)? (2) Has it been subjected to peer review and publication? (3) Is there a known or potential high rate of error and are there standards controlling the techniques of operation? (4) Is the theory or technique generally accepted within the relevant community?

*Starling v. Union Pac. R.R. Co.*, 203 F.R.D. 468, 476 (D. Kan. 2001) (citing *Kumho Tire Co.*, 526 U.S. at 149).  "[T]hese factors are not exclusive [ones] and may not apply in many cases." *Id.*  When the challenged experts are treating physicians—as they are here—"these factors are a bit unwieldy."  *Id.*

Defendants argue that Drs. Kaplan and Seeley are exempt from the Rule 702 analysis because they treated plaintiff.  Instead, defendants argue, the challenged testimony is admissible as lay opinions under Rule 701.

"A treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment of the party."  *Davoll v. Webb*, 194 F.3d 1116, 1138 (10th Cir. 1999) (citations omitted).  "A treating physician's testimony is based on the physician's personal knowledge of the examination, diagnosis and treatment of a patient, and not on information acquired from outside sources."  *Goeken v. Wal-Mart Stores, Inc.*, No. 99-4191-SAC, 2001 WL 1159751, at *2 (D. Kan. Aug. 16, 2001) (correction and citation omitted).  A treating physician's opinions about "the cause of any medical condition presented in a patient, the diagnosis, the prognosis and the extent of disability,

if any, caused by the condition or injury" are "encompassed in the ordinary care of a patient and do not subject the treating physician" to the requirements of an expert. *Id.* Also, "[a] treating physician, even when testifying as a lay witness, may state 'expert' facts to the jury in order to explain his testimony." *Davoll*, 194 F.3d at 1138 (citation omitted).

Here, both Drs. Kaplan and Seeley treated plaintiff. So, they may testify about things they observed during their treatment. And their testimony may include opinions encompassed within their "ordinary care" of plaintiff. *See Goeken*, 2001 WL 1159751 at *2. But when the challenged testimony goes beyond the scope of the physician's personal knowledge based on his examinations during treatment, the court must analyze it just as it would any expert testimony. *See id.* (explaining, when "a treating physician is to testify on matters not based on his or her observations made during the care and treatment of the party," the physician must be treated as an expert).

The plaintiff couches his arguments to exclude testimony by Drs. Kaplan and Seeley as ones challenging three types of opinions: (1) whether plaintiff was qualified to perform the job; (2) the nature of driving laws; and (3) what plaintiff is expected to disclose to an employer. The court adopts this numbering convention, addressing plaintiff's challenge in the following three subsections.

### 1.    Whether Plaintiff was Qualified to Perform the Job

Plaintiff seeks to exclude testimony from Drs. Kaplan and Seeley that opine whether plaintiff was qualified to perform his job with CMKA. This request reaches the first opinion[3]

---

[3]    *I.e.*, "the effect of Plaintiff's seizure disorder on Plaintiff's qualification for employment with CMKA and other employers, [and] his ability to perform job duties at CMKA or other employers . . . ."

and Dr. Kaplan's fourth opinion about what employment plaintiff should pursue.  Also, it

reaches the opinion the fifth question seeks to elicit from Dr. Seeley.[4]

First, the court provides a summary of its rulings on these opinions:

| Opinion | Permissible | Impermissible |
|---|---|---|
| *First* | May opine about plaintiff's ability to perform daily activities | May not opine about whether plaintiff is qualified to perform the job |
| *Fourth* | | May not opine about what employment plaintiff should pursue |
| *Fifth* | May testify about recommendations made to plaintiff during treatment | |

Plaintiff argues, first, that the issue whether plaintiff was qualified to perform the

essential functions of his job is an ultimate issue that the jury must decide.  Then, he argues, the

questions posed to Dr. Seeley that led to the fifth opinion would confuse a jury.  Finally, plaintiff

contends, Dr. Kaplan and Dr. Seeley are not qualified to provide testimony whether plaintiff was

qualified to perform the essential functions of his job because they have no specialized

knowledge and do not base their opinions on sufficient facts or data.  And importantly, plaintiff

notes, the two neurologists did not use the required two-step analysis to determine whether

plaintiff is qualified under the ADA.

In their responses, defendants characterize plaintiff's arguments differently.  AWG

argues that "Drs. Kaplan and Seeley are not opining as to whether Plaintiff was qualified to

---

[4]    *I.e.*,

So assuming all of that to be true and that one of his job duties involved driving a car, based on what you knew of his epilepsy and the fact that he had breakthrough seizures, I think reported in the medical records every three to four months, is that a job that you would have told him he was medically qualified to perform?

Doc. 178-4 at 1 (Seeley Dep. 50:13–20).

perform a certain job. Rather, the testimony is offered to inform the jury what activities Plaintiff was told by his neurologists would be safe for him to perform in light of his medical condition . . . ." Doc. 186 at 10. This, AWG contends, will "assist the jury in determining whether Plaintiff could perform the Asset Protection Agent position safely . . . ." *Id.* at 11. CMKA takes a slightly different tack. It argues that Dr. Kaplan and Dr. Seeley informed plaintiff of the driving restriction. So, CMKA asserts, "if a position requires driving as part of the qualifications of the job, and both doctors have personal knowledge confirming that Plaintiff cannot drive, then they are qualified to testify that Plaintiff cannot or should not fill that particular job." Doc. 187 at 10.

"An expert may offer an opinion even if it 'embraces an ultimate issue to be determined by the trier of fact.'" *Starling*, 203 F.R.D. at 476. "Nevertheless, an expert may not simply tell the jury what result it should reach" by stating a "legal conclusion." *Id.* (citing *United States v. Simpson*, 7 F.3d 186, 188 (10th Cir. 1993)). Here, the challenged opinions come from treating physicians—not experts. "A treating physician, even when testifying as a lay witness, may state 'expert' facts to the jury in order to explain his testimony." *Davoll*, 194 F.3d at 1138 (citation omitted). But the treating physician still must base his opinion on plaintiff's ordinary care. *Goeken*, 2001 WL 1159751 at *2.

Our court applied these restrictions to treating physicians in *Starling*. There, the court allowed the treating physicians to "explain how the symptoms of [Post Traumatic Stress Disorder] impair[ed] a person's daily activities." 203 F.R.D. at 477. But when the proponent of the testimony proffered that the treating physicians would testify about the plaintiff's ability to perform the duties of a specific job, the court required the proponent to lay a foundation showing

that the physicians knew the job duties.  *Id.* at 478.  To reach this conclusion, *Starling* examined the reasoning of *Zarecki v. Nat'l R.R. Passenger Corp.*, 914 F. Supp. 1566 (N.D. Ill. 1996).

In *Zarecki*, the court treated a treating physician's opinions as expert opinions because the physician offered opinions about the cause of plaintiff's injury and the injuries' foreseeability based on the work conditions.  914 F. Supp. at 1573.  The court ruled that the physician's opinions were not based on personal observations because there was nothing in the record suggesting that the physician had visited the work site.  *Id.*

*Starling* followed this reasoning, requiring a factual foundation showing that the treating physicians knew what the job entailed.  203 F.R.D. at 478.  In closing, the court noted that "an otherwise qualified social worker or physical medicine specialist could opine about the ability of [plaintiff] to perform specific acts or job tasks."  *Id.*

Here, as plaintiff contends, CMKA's argument goes too far for two distinct reasons.  CMKA's position assumes driving is an essential function and states a legal conclusion—whether plaintiff is qualified to perform a job.  In contrast, AWG's position is permissible.

CMKA begins by correctly asserting, "The testimony of Dr. Kaplan and Dr. Seeley related to *Plaintiff's disability and how it affects his ability to perform day-to-day activities* is certainly under the purview of topics upon which a plaintiff's treating physician is entitled to opine pursuant to Fed. R. Evid. 701."  Doc. 187 at 9 (emphasis added).  CMKA adds, "[i]f each neurologist is qualified to make the determination that Plaintiff has a seizure disorder, each is also qualified to *testify about life activities a person can and cannot perform due to that seizure disorder*."  *Id.* (emphasis added).  As AWG points out, "the testimony is offered to inform the jury what activities Plaintiff was told by his neurologists would be safe for him to perform in light of his medical condition and assist the jury in determining whether Plaintiff could perform

the Asset Protection Agent position safely . . . ."  Doc. 186 at 10–11.  This is permissible under *Starling*'s reasoning because the neurologists confine their opinions to plaintiff's abilities to perform daily activities.  Those opinions, in turn, will assist the jury.  *See* Fed. R. Evid. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . helpful to clearly understanding the witness's testimony or to determining a fact in issue . . . .").  But CMKA exceeds Rule 701's scope when it argues that these neurologists should be able to testify whether plaintiff is qualified to fill a particular job—a legal conclusion that tries to tell the jury how to decide the case.

    In sum, the testimony proffered in the first opinion is impermissible.  In *Starling*, the court required a reasonable foundation showing that the treating physicians knew plaintiff's job duties.  203 F.R.D. at 478.  But here, even a reasonable foundation will not make the first opinion permissible because the opinion would render two legal conclusions.  The *Starling* court did not face that issue because plaintiff sought relief for tort liability.  *Id.* at 470.  So plaintiff's qualification to perform a job was not an element of plaintiff's prima facie case.  Here, it is an element.  *See Adair v. City of Muskogee*, 823 F.3d 1297, 1304 (10th Cir. 2016) (holding, to establish a prima facie case of discrimination, plaintiff must show:  "he is qualified, with or without reasonable accommodation by the employer, to perform the essential functions of the job.").  So, an opinion about whether plaintiff is qualified is a legal conclusion.  Also, by opining whether plaintiff is qualified to perform the job, the neurologists necessarily must recite the job's essential functions—another legal conclusion and one that neither expert has special training, skill, or experience to provide.  *See Adair*, 823 F.3d at 1307 (holding that to determine whether plaintiff is a qualified individual, the court, first, inquires "whether the plaintiff can perform the essential functions of the job.").  So, to opine whether plaintiff is qualified to perform the job, the

treating neurologists must state two legal conclusions.  Although a treating physician may state

expert facts to explain their opinions, *see Davoll*, 194 F.3d at 1138, he "may not simply tell the

jury what result it should reach."  *Starling*, 203 F.R.D. at 476.

 For these reasons, the court excludes testimony from Drs. Kaplan and Seeley about

plaintiff's qualification for employment.  But defendants properly may elicit testimony from Drs.

Kaplan and Seeley about "Plaintiff's disability and how it affects his ability to perform day-to-

day activities"—such as driving or being alone.  *See id.* at 477.

 These neurologists also may testify about any advice they gave plaintiff about seizure

precautions.  This advice would be based on "the physician's personal knowledge of the

examination [and] diagnosis and treatment of a patient."  *See Goeken*, 2001 WL 1159751 at *2.

And so, treating physician testimony on such advice is permissible.

 This ruling also decides the dispute over the fifth opinion.  Although the question posed

by AWG's counsel in that opinion would be improper considering the court's ruling here, Dr.

Seeley's response is not.  Dr. Seeley responded, merely, "I would not recommend operating a

motor vehicle . . . if he was not six months seizure free."  Doc. 178-4 at 1 (Seeley Dep. 50:25–

51:2).  This is the type of observation the court would expect a treating physician to express

because it consists of a recommendation based on the physician's treatment of plaintiff.  *See*

*Davoll*, 194 F.3d at 1138. So Drs. Kaplan and Seeley properly may testify about their

recommendations to plaintiff based on his condition.

 To the extent that plaintiff's request includes the fourth opinion, the court finds that

testimony about whether plaintiff should pursue employment is like asking whether he is

qualified to perform a job.  It is too far removed from a permissible recommendation based on

plaintiff's treatment and too close to stating an impermissible legal conclusion—whether

plaintiff was qualified to perform a job. *See Starling*, 203 F.R.D. at 476. The court thus excludes this type of opinion testimony.

For these reasons, the court grants the portions of plaintiff's motion seeking to exclude testimony about plaintiff's qualification to perform certain jobs and what employment he should have pursued.

### 2.    The Nature of Driving Laws

Next, plaintiff seeks to exclude testimony about the second opinion—"the law in Kansas and Missouri on whether individuals with seizure disorders may operate a motor vehicle after experiencing a seizure . . . ."

The court summarizes its ruling in this fashion:

| Opinion | Permissible | Impermissible |
|---------|-------------|---------------|
| *Second* | May testify about what they told plaintiff about the laws | May not testify about the actual content of the traffic laws |

Plaintiff contends that Drs. Kaplan and Seeley are not legal experts and the driving restriction can be communicated to the jury some other way. Thus, he contends, the court should prohibit them from testifying that "the law is" this, or that.

Both defendants respond that these neurologists advise their patients—plaintiff, specifically—about their understandings of Kansas and Missouri driving laws as they apply to persons with seizure disorder. AWG adds that this testimony would help the trier of fact when determining whether plaintiff could perform the essential functions of the position.

As a fact witness under Rule 701, "[a] treating physician's testimony is based on the physician's personal knowledge of the examination, diagnosis and treatment of a patient, and not on information acquired from outside sources." *Goeken*, 2001 WL 1159751 at *2. Drs. Kaplan and Seeley stay within those parameters when they testify about the advice they gave plaintiff

about the driving laws because they gave this advice while treating plaintiff. *See Davoll*, 194 F.3d at 1138. They exceed those parameters, however, when they testify what the law is. That status is information acquired from an outside source and would require a legal expert's opinion. *See Goeken*, 2001 WL 1159751 at *2 ("A treating physician's testimony is . . . *not [based] on information acquired from outside sources*." (emphasis added)). Defendants have not qualified either neurologist as an expert in driving laws.

In short, these neurologists may testify what they told plaintiff about the laws as part of their treating relationship with him. They may not testify that the law is what they say it is. For these reasons, the portion of plaintiff's motion seeking this exclusion is granted in part and denied in part.

### 3.    What Plaintiff is Expected to Disclose to an Employer

Finally, plaintiff argues that the court should prohibit Drs. Kaplan and Seeley from testifying about what plaintiff is expected to disclose to an employer. This dispute encompasses the third opinion and the first question posed in the sixth opinion.

These are the court's rulings on these subjects:

| Opinion | Permissible | Impermissible |
|---------|-------------|---------------|
| *Third* | | May not testify about what plaintiff is expected to disclose to an employer |
| *Sixth* | May testify about recommendations made to plaintiff during treatment | May not testify about what plaintiff is expected to volunteer to an employer |

Plaintiff contends that neither doctor is qualified to testify in this manner because there is no indication that they have any training on ADA disclosures. In response, defendants argue that these neurologists are not engaging in a legal analysis of disclosure obligations; instead, defendants contend, their expectations of what plaintiff should have disclosed is an extension of their advice to him about seizure precautions.

15

Defendants' argument does not convince the court. Advice to plaintiff is something the court already has found involves treatment. But there is no suggestion in the facts that the neurologists conveyed the disputed expectations to plaintiff. So, the court concludes that the neurologists' opinions about what they expected plaintiff to disclose to a putative employer is not based on their treatment of plaintiff. *See Davoll*, 194 F.3d at 1138.

But this conclusion does not resolve the dispute. In addition, the court must analyze these opinions as it does any expert testimony offered under *Daubert* and Rule 702. *See Goeken*, 2001 WL 1159751 at *2. The court must ensure that the proffered opinions rest both on "a reliable foundation" and are "relevant to the task at hand.'" *Kumho Tire Co.*, 526 U.S. at 141 (quoting *Daubert*, 509 U.S. at 597). The court concludes that Dr. Kaplan and Dr. Seeley's expectations of what plaintiff should disclose to an employer are not relevant because their expectations will not assist the trier of fact. *See Daubert*, 509 U.S. at 592–93 ("the expert [must] testify to scientific knowledge that will assist the trier of fact to understand or determine a fact in issue"). With all respect for the physicians' medical training and experience, their opinions on this subject are no better informed than any other member of our society. And permitting two credentialed witnesses to opine about this question might mislead the jury to think that their opinions matter because of their medical acumen.

Even if Dr. Kaplan and Dr. Seeley's expectations somehow were relevant, they do not rest on a reliable foundation. They do no rest on special knowledge or training. For these reasons, the court excludes testimony from these witnesses about what plaintiff was expected to disclose to an employer, as presented in the third opinion.

This ruling also decides the question for the sixth opinion. There, AWG's counsel first asked Dr. Seeley what he expected plaintiff to volunteer to an employer about his condition. The

16

court discerns no real difference between "disclose" and "volunteer" in this context. So this question is improper in light of the court's ruling. But, in contrast, the second question AWG's counsel asked Dr. Seeley in the sixth opinion is permissible. AWG's counsel asked, "Would you advise [plaintiff] that he should let his employer know that he was not medically able to drive a car or shouldn't be driving a car because he had had a seizure within the past . . . six months?" The court already has determined that these neurologists may testify properly about advice they would give plaintiff based on their treatment of him.

For these reasons, the court grants plaintiff's Motion to Exclude (Doc. 177) in part and denies it in part, as described in detail in this Order.

## II.   Motions for Summary Judgment

Now, the court turns to the motions for summary judgment. Each party requests summary judgment. Plaintiff seeks partial summary judgment on the issue whether his seizure disorder qualifies as a disability under the ADA. Both defendants ask for summary judgment against plaintiff's two claims. And AWG also seeks summary judgment on the issue whether it was plaintiff's employer.

For the reasons explained in the rest of this Order, the court grants plaintiff partial summary judgment, grants AWG summary judgment, and grants in part and denies in part CMKA's Motion for Summary Judgment.

A.    Facts[5]

The following facts are either stipulated facts taken from the Pretrial Order (Doc. 173),

uncontroverted or, where controverted, stated in the light most favorable to the party opposing

that particular summary judgment motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### 1.    Plaintiff's Seizure Disorder and His Treatment

Plaintiff has a diagnosis of epilepsy because he had recurrent seizures that were

unprovoked.[6]  Epilepsy is characterized by individual episodes which come in the form of

seizures.[7]  Plaintiff has had a seizure disorder for at least 11 years.  When he turned 16 years old,

plaintiff started seeing a physician regularly about his seizure disorder.  Two of plaintiff's

treating neurologists were Dr. Seeley and Dr. Kaplan.

Plaintiff considers his family medicine doctor, Dr. Ferguson, to be his primary care

physician.  Dr. Ferguson is not a neurologist and fewer than 5% of his patients have a seizure

disorder.  Dr. Ferguson did not take over plaintiff's seizure care from plaintiff's treating

neurologists.  But from approximately October 2015 to April 2017, Dr. Ferguson was the only

---

[5]    In its Memorandum and Order dated April 13, 2017 (Doc. 112), the court noted that some of the
evidence plaintiff intended to rely on in his Response to AWG's Motion to Dismiss or, in the Alternative,
for Summary Judgment "was not yet admissible."  Doc. 112 at 17.  The court explained that "[t]o make
this evidence admissible . . . plaintiff must depose AWG and/or [CMKA] employees." *Id.*; *see Adler v.
Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) ("[Summary judgment facts must be identified
by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." (citing *Thomas
v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992))).  Plaintiff continues to rely on
inadmissible evidence at this stage, and AWG objects.  Specifically, plaintiff relies on Documents 65-1 (a
December 15, 2014 email between an unknown sender and recipients), 65-10 (October 10, 2014 email
traffic between Cindy Davis and Jeff Harper), 65-14 (an untitled summary of various events in 2014), and
200-16 (CMKA Termination Report) for his additional statements of material fact in response to AWG's
Motion for Summary Judgment. *See* Doc. 199 at 52–53.  But, plaintiff fails to cite to any deposition
transcript or affidavit purporting to make these documents admissible as evidence.  In brief, plaintiff fails
to authenticate these documents in any way.  They also present hearsay problems.  The court thus
excludes them when ruling the summary judgment motions.

[6]    Epilepsy is a physiological condition or disorder that affects plaintiff's neurological system.

[7]    Seizures occur in an episodic fashion and is an episodic condition.

doctor managing plaintiff's seizure disorder.  Throughout his treatment of plaintiff—including the period at issue here, 2014—Dr. Ferguson always told plaintiff that he needed to seek treatment from a neurologist.  Dr. Ferguson doesn't think plaintiff sought or received consistent treatment by a neurologist during 2014.  But Dr. Ferguson believed plaintiff was receiving some seizure care from Dr. Kaplan during that period.

### a.    Seizures

Plaintiff's seizure disorder causes him to experience both grand mal (or tonic-clonic) seizures and complex partial seizures.  Grand mal seizures cause plaintiff to lose consciousness.  During a complex partial seizure, plaintiff has "difficulty doing anything purposefully."  Doc. 176-1 at 10 (Seeley Dep. 135:1–4).

Epilepsy—through seizures—affects activities of daily living.  Dr. Seeley and Dr. Kaplan opine that when plaintiff is having a seizure, he is unable to perform manual tasks, his ability to concentrate is limited, and he is substantially limited in his ability to communicate.

Generally, plaintiff's seizures are between three and six months apart.  Since 2008, plaintiff has never gone more than six months between seizures.  But he never has had seizures on back-to-back days.  As he explained to his doctors, plaintiff sometimes experiences an aura— a warning that a seizure is coming on; but sometimes he does not.

During past seizures, plaintiff has been unconscious for as long as 45 seconds.  He characterizes the period after unconsciousness as "coming to," and he explained that it can take up to five minutes for him to "come around."  Doc. 183-2 at 4 (Crumpley Dep. 10:1–6).  In 2013 and 2014, plaintiff's seizures lasted between 60 and 90 seconds.

After a normal seizure, plaintiff is in a postictal state for as long as an hour and he also has a headache.  Dr. Ferguson witnessed one of plaintiff's seizures and noted that plaintiff had

very "little postictal," meaning "within a very, very short period of time he was back to exactly where he was before he came in." Doc. 200-7 at 3 (Ferguson Dep. 93:4–10).

Plaintiff has a history of breakthrough seizures. This means that plaintiff continued to have seizures even though he was on medication. For patients who have generalized tonic-clonic seizures, like plaintiff, taking medication consistently and in the right amount is crucial for controlling a seizure disorder. In plaintiff's case, his medications did not always control his seizures.

Although there is no cure for seizure disorder, seizure surgery eliminates a patient's seizures 20 to 25 percent of the time. A Vagal Nerve Stimulator is another medical option for patients with seizure disorder. In Dr. Kaplan's experience, this treatment can result in significantly improved seizure control in about 75 percent of patients. Dr. Seeley repeatedly recommended a Vagal Nerve Stimulator to plaintiff to help him control the number of seizures he experiences. Dr. Kaplan also believes plaintiff was a good candidate for this procedure. But plaintiff did not undergo the procedure because, based on his own personal experience, he did not feel he needed it. Plaintiff believes that he didn't need the procedure because his seizures occurred so far apart and milder than seizures he has witnessed others experience.

Plaintiff failed to follow the directives from Dr. Seeley, his treating neurologist, to seek regular follow up care. Between January 2010 and February 2013, plaintiff followed up with Dr. Seeley two times. Plaintiff went 11 months from January to December 2010 without following up with Dr. Seeley. He then went another eight months—until August 2011—without follow up care. Finally, he went until February 2013—18 months—without following up with Dr. Seeley.

b.      **Seizure Precautions**

Plaintiff's treating neurologists warned plaintiff about standard seizure precautions during his treatment for his seizure condition.  These precautions included refraining from: driving a vehicle; working at certain heights; and working alone or being alone for extended periods of time for six months after a seizure.  The neurologists recommended these precautions to decrease plaintiff's risk of serious, adverse events while experiencing a seizure, which are more common within the six months after a seizure.  Because of the seriousness of the risk, driving within six months after a seizure is one of the most important precautions.  The seizure precaution against working alone or being alone for extended periods of time is also important because an individual with a seizure disorder risks complications such as choking, aspiration pneumonia, or Sudden Death of Epilepsy ("SUDEP").

Plaintiff's doctors informed him that it is illegal for him to drive in Kansas and Missouri[8] within six months after he experiences a seizure.  But plaintiff cannot recall definitively whether

---

[8]     Kansas drivers' licensing law provides:

Seizure disorders which are controlled shall not be considered a disability.  In cases where such seizure disorders are not controlled, the director or the medical advisory board may recommend that such person be issued a driver's license to drive class C or M vehicles and restricted to operating such vehicles as the division determines to be appropriate to assure the safe operation of a motor vehicle by the licensee.  Restricted licenses issued pursuant to this paragraph shall be subject to suspension or revocation.  **For the purpose of this paragraph, seizure disorders which are controlled means that the licensee has not sustained a seizure involving a loss of consciousness in the waking state within six months preceding the application or renewal of a driver's license and whenever a person licensed to practice medicine and surgery makes a written report to the division stating that the licensee's seizures are controlled.  The report shall be based on an examination of the applicant's medical condition not more than three months prior to the date the report is submitted.**  Such report shall be made on a form furnished to the applicant by the division.  Any physician who makes such report shall not be liable for any damages which may be attributable to the issuance or renewal of a driver's license and subsequent operation of a motor vehicle by the licensee.

Kan. Stat. Ann. § 8-247(e)(6).

he investigated the legality of driving in those circumstances.  His understanding was that, as a Missouri resident, he could not drive for three months after a seizure.

Dr. Seeley told plaintiff about the seizure precautions, including the one against driving within six months after a seizure.  Dr. Seeley also displays posters in his office that advise it is illegal in both Kansas and Missouri to drive within six months of a seizure.  And Dr. Kaplan strictly cautioned plaintiff that it was illegal to drive in the six months after a seizure, and that he could "seriously hurt or even kill someone if he were to have an episode or seizure while driving." Doc. 180-3 at 9 (Kaplan Dep. 51:23–52:5).  Despite the standard six-month seizure precaution, Dr. Kaplan opined that plaintiff should not drive at all unless he has seizure surgery and is seizure free for two years.  Even small seizures can pose a danger to someone who is driving a motor vehicle.[9]

---

Missouri drivers' licensing law provides:

> The director, having good cause to believe that an operator is incompetent or unqualified to retain his or her license, . . . may require the person to submit to an examination as prescribed by the director.  Upon conclusion of the examination, the director may allow the person to retain his or her license, may suspend, deny or revoke the person's license, or may issue the person a license subject to restrictions as provided in section 302.301.  If an examination indicates a condition that potentially impairs safe driving, the director, in addition to action with respect to the license, may require the person to submit to further periodic examinations.

Mo. Rev. Stat. § 302.291.  A person is incompetent to drive a motor vehicle when he "has become physically incapable of meeting the prescribed requirements of an examination for an operator's license . . ." *Id.* § 302.010(8).

The court may judicially notice state statutes.  *Clemmons v. Bohannon*, 918 F.2d 858, 865 n.5 (10th Cir. 1990), *vacated on other grounds on rehearing*, 956 F.2d 1523 (10th Cir. 1992).  This includes notice taken at summary judgment.  *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001).

[9]    Dr. Ferguson opined that a neurologist should provide seizure precautions to their patients, including, specifically the precaution against driving a motor vehicle.  He was not aware of the laws in Kansas or Missouri about driving a motor vehicle after experiencing a seizure.

Plaintiff never disclosed his seizure disorder to either the State of Kansas or the State of Missouri. Specifically, when acquiring or renewing his driver's license, plaintiff never has disclosed that he has a seizure disorder. Plaintiff did not recall whether the Missouri driver's licensing agency asked him about a seizure disorder when he submitted his driver's license application.

Plaintiff agrees that the reason for seizure precautions—including the ones against driving, working at certain heights, and working alone or being alone for extended periods of time—is for the safety of himself and others. Specifically, plaintiff knows and agrees that it is dangerous for him (and others) to drive a car during the six months after he has experienced a seizure because of the potential for another seizure, and possibly causing him to crash and hurt himself or others. But, plaintiff did not comply with the directives from his physicians against driving a vehicle for six months after experiencing a seizure because he needed to work and had needed a way to get to work. Plaintiff has driven and continues to drive within six months after seizures.[10]

Plaintiff has had two motor vehicle accidents that occurred because he had a seizure while he was driving—one on March 16, 2008, and another on May 4, 2015. Both accidents injured plaintiff. During the 2008 accident, plaintiff's younger brother was in the car with him. Plaintiff remembers waking up in the back of an ambulance after the 2015 accident. After the 2008 motor vehicle accident, plaintiff only took a week off from driving. And after the 2015 motor vehicle accident, he took three to four days off before driving again.

Regardless of any safety concerns, plaintiff has chosen not to abide by driving laws and his doctors' seizure precautions when he does not agree with them. He does not believe he

---

[10]   Plaintiff's mother also has expressed concerns about him working alone and driving within six months of a seizure.

should be treated differently than a diabetic whose blood sugar may plummet and cause him to pass out while driving.

The seizure precautions, notwithstanding, plaintiff contends his doctors never have restricted him from performing any activity.

### 2.    Agreement between AWG and CMKA

CMKA provides security and investigative services to its clients.  Those services include armed and unarmed security guarding, armed executive protection, security consulting, and investigative services.  In August 2013, AWG and CMKA entered into an Unarmed Premium Asset Protection Service Agreement ("Agreement").  This agreement provided that CMKA would supply Asset Protection Agents (*i.e.*, security guards) to provide security and related services for AWG's location in Kansas City, Kansas.  The Agreement provided, in relevant part:

**II. PERSONNEL**

a. All Asset Protection Agents furnished by CMKA shall be employees, agents or subcontractors of CMKA, which is acting as an independent contractor for [AWG]. CMKA will pay all wages and appropriate expenses, and, for its employees, all Employers' Federal, State, and Social Security taxes, Federal and State Employment taxes, and any other required personnel taxes.  [AWG] shall not direct or supervise any of CMKA's Asset Protection Agents.

b. CMKA will provide its Asset Protection Agents with uniforms, and all necessary equipment, as mutually agreed upon between [AWG] and CMKA.  [AWG] shall have the right to reject for any reason any Asset Protection Agent assigned by CMKA to [AWG] facility, and CMKA shall provide a satisfactory replacement as soon thereafter as possible.

c. [AWG] agrees that it will not employ, as an Asset Protection Agent or in any related capacity, directly or indirectly, any person who has been employed by CMKA and assigned to the [AWG] facility, for a period of one hundred eighty (180) days following the last date on which CMKA employed that person.

. . .

### III. SCOPE OF WORK

. . .

b. The conduct and scope of responsibility of all Asset Protection Agents assigned to [AWG]'s facility shall be governed by policy, rules and Post Orders mutually agreed to by both parties and made a part of this Agreement. This data may be revised and supplemented at any time in writing upon mutual agreement of both parties. No alteration of Post Orders can be given by [AWG] unless in writing and signed by both parties.

c. It is understood that CMKA will be responsible for the hiring, uniforming, training, and supervision of all Asset Protection Agents provided for [AWG] unless otherwise agreed to by [AWG] . . . .

### IV. BILLING, TERMS AND RATE GUARANTEES

a. CMKA will deliver weekly invoices containing a complete detail of the hours worked by CMKA's employees on-site as Asset Protection Agents to [AWG] at the address specified. A detailed statement of the number of hours worked by each Asset Protection Agent will also be supplied or made available at [AWG]'s request. Invoices shall be due and payable upon receipt without offset of any kind or nature whatsoever . . . .

Doc. 180-10 at 1–2. Also the Agreement required CMKA to maintain "statutory worker's compensation insurance . . . [and] employer's liability insurance." Doc. 180-10 at 4. The Agreement required AWG to pay CMKA $16.00 for each service hour worked by CMKA employees at AWG's facility. CMKA managed overtime, and AWG only paid CMKA the overtime rate—time and a half—when AWG requested a specific agent to work beyond the schedule or when the agent worked on a nationally-recognized holiday.

AWG originally entered the Agreement with CMKA so that CMKA could provide security officers to staff the AWG Guard Shack. Five months later, AWG decided to outsource this position. In March 2014, CMKA began providing personnel to cover some of the desk security officer ("Desk Officer") shifts and limited patrol/EMT ("EMT/Patrol Officer") shifts at AWG's location in Kansas City, Kansas. Initially, CMKA provided Asset Protection Agents to

cover the Desk Officer position for 88 hours per week and the EMT/Patrol Officer for 56 hours per week. Beginning about June 2014, AWG reduced the number of hours it needed from the CMKA Asset Protection Agents for the EMT/Patrol Officer position from 56 hours per week to 16 hours per week.

### 3.    Plaintiff's Application to CMKA

Plaintiff responded to a CMKA posting on Craigslist seeking "EMT/Security Guards (unarmed) to work at a Kansas City, KS business." *See* Doc. 183-4 at 1. He submitted a cover letter and his résumé to CMKA. The Craigslist job posting was the only job description plaintiff saw for this position. It listed the experience and the skills required. The advertised position required a certified and licensed EMT who was reliable, punctual, trustworthy, and customer-service oriented. Also, the position required good oral and written communication skills, basic computer operation skills, professional representation of the company, good physical condition, and a neat and clean appearance.

In early March 2014, plaintiff interviewed for the job. Two CMKA supervisory employees—Terry Threadgill and Jeff Harper—interviewed plaintiff. During the interview, they did not ask plaintiff whether he suffered from any medical conditions. They also did not ask this question after he was hired. And although plaintiff knew during the application and interview process that the position might include driving and working alone, he did not inform anyone at CMKA about his seizure disorder or the seizure precaution directives (*i.e.*, no driving or working alone). Because he had suffered a seizure in January 2014, the seizure precautions warned plaintiff against driving or working alone until July 2014. But plaintiff told Mr. Harper during the CMKA interview in March 2014 that he was physically able to perform the job duties, including driving and working alone, even though that contradicted the directives he had

received from his doctors.  Plaintiff agrees he hid his seizure disorder and related restrictions from CMKA so he could get the job there.

Not long after the interview, CMKA hired plaintiff as an Asset Protection Agent and he held that position throughout the time he worked for CMKA.  He was an on-call employee, which meant that CMKA called him to work when hours were available.  The job duties of an Asset Protection Agent differed depending on the needs of the customer and the job site. An Asset Protection Agent assigned to AWG worked in the guard shack, worked at the front desk, performed EMT duties, and performed patrol duties.  Scheduling for the Asset Protection Agents varied based on the clients' needs.  But from March through May 2014, AWG only needed Desk Officers—not EMT/Patrol Officers.

AWG was not involved in plaintiff's application or interview process.  Nor was AWG involved in the decision to hire plaintiff.  Generally, AWG was not involved in CMKA's Asset Protection Agent hiring process.  But on May 23, 2014, Rod Smith, CMKA's Chief Operations Officer, sent Jerry Burke, AWG's Senior Manager for Corporate Security, an email with candidates' resumes attached.  Mr. Smith told Mr. Burke that he was attending the interviews "to get a better sense of who to select . . . or at least [who] to offer to you as a candidate."  Doc. 180-27 at 2.  After one of the candidates completed his background check and initial drug screening, Mr. Smith planned to send the candidate over "for a look by" Mr. Burke and AWG's Security Supervisor in Kansas City, Kansas.  *Id.*[11]

---

[11]    Since March 2014, CMKA has not had any clients—other than AWG—who required EMTs. CMKA never had tried to recruit EMTs for any work assignments before its relationship with AWG began.  CMKA experienced difficulty finding qualified people to fill these positions.

### 4.    Plaintiff's Employment Paperwork, Pay, and Benefits

CMKA conducts a new hire orientation program.  It includes reviewing the CMKA Employee Handbook and completing necessary paperwork.  Plaintiff has no independent recollection of this orientation.  But he did receive the CMKA Employee Handbook, the Asset Protection Agent Employee Handbook Supplement, and Safety Program Handbook.  Plaintiff reviewed the CMKA Handbook and signed an acknowledgement form confirming that he had received, read, and understood the policies included in CMKA's Employee Handbook.[12]

The CMKA Employee Handbook contains a Progressive Discipline Policy with six levels of discipline, culminating with dismissal.  The dismissal subsection included the following provisions:  "Actions taken may deviate from recommendations listed due to extenuating circumstances," and "Project Managers have the authority to execute immediate suspensions from the site based on their judgment."  Doc. 209-15 at 49–50.

The Handbook also listed ten offenses that could result in immediate dismissal:

1. Possession of unauthorized weapons at work.
2. Abandoning post without proper relief.
3. Using or being under the influence of alcohol, intoxicants, illegal drugs, controlled substances (to include certain prescription drugs) while on the job.
4. Falsifying any CMKE or client record, including application, timesheets, logs, tour reports, and requests for reimbursements.
5. Theft of or deliberate damage to CMKE or client property.
6. Violation of CMKE's use of force/escalation of force policy.
7. Conviction for or pleading guilty to violation of any felony criminal statute or code.
8. Repeated violation of safety rules.
9. Sexual or other harassment of client, other contractor or [CMKA] employees.
10. Sleeping on the job.

*Id.* at 48–49.

---

[12]    Plaintiff does not recall ever seeing or receiving any AWG employee handbook.

Plaintiff also read the CMKA policies about Equal Opportunity and the Americans with Disabilities Act that are contained in the CMKA Handbook.  Plaintiff knew he could ask questions if he did not understand any of the policies, but he did not need to ask any questions.  Plaintiff understood the policies.  And he knew at the outset of his employment with CMKA that if he had any concerns or complaints about discrimination or retaliation, he had an obligation to report them to CMKA.

During the time he worked for CMKA, plaintiff signed off on various other paperwork.  It indicated that he received, read, and understood CMKA's programs and policies.  These programs and policies included a non-discrimination and anti-harassment policy, a time sheet submission policy, and a scheduling guidance policy.  Plaintiff also signed CMKA's Conflict of Interest and Outside Employment Statement.  It acknowledged that CMKA was his sole employer.  Finally, plaintiff signed a business protection agreement with CMKA.  In it, plaintiff indicated that he was an at-will employee of CMKA.  Plaintiff does not recall ever signing any similar pre-hire paperwork with AWG.

On March 5, 2014, plaintiff acknowledged that he would be required by CMKA (not AWG) to obtain "investigator/asset protection licenses for [his] respective areas of responsibility upon hire," and he did, in fact, obtain those licenses.  Doc. 60-7 at 2.

On April 8, 2014, Ms. Threadgill confirmed CMKA's offer of employment to plaintiff by letter.  This letter confirmed plaintiff's rate of pay, provided him with information about the license that CMKA required plaintiff to secure (including a statement that CMKA would reimburse licensing fees after he completed six months of employment), and noted that CMKA would issue plaintiff its standard uniform.  Ms. Threadgill also confirmed to plaintiff that his employment with CMKA was at-will, and the letter did not create a contract for employment

with CMKA of a definite duration.  Plaintiff also received a second letter from CMKA explaining that he would be eligible for CMKA's employee stock ownership plan.

During his employment with CMKA, CMKA paid plaintiff at the rate of $10.00 per hour. He never received any pay or salary from AWG.  AWG did not set plaintiff's pay rate, issue plaintiff paychecks, or pay his employment taxes.  Plaintiff signed paperwork authorizing CMKA to pay him through direct deposit; he did not sign any such paperwork for AWG.  And CMKA provided his tax forms.  Finally, plaintiff submitted federal I-9 paperwork to CMKA, not to AWG.  AWG provided plaintiff no benefits. He did not receive stock ownership or insurance from AWG, and, if he took vacation days, CMKA—not AWG—paid him for those days.

CMKA maintained a personnel file on plaintiff.  CMKA required plaintiff to fill out timesheets for CMKA; he did not submit time records to AWG.  AWG required plaintiff to create daily activity reports and daily shift summaries which detailed activities that occurred while plaintiff provided services on site at AWG.  AWG maintained these reports and summaries in its records.

### 5.    Plaintiff's Assignment at AWG

From March 2014 through August 21, 2014, plaintiff was employed by CMKA and assigned to AWG's Kansas City, Kansas facility.  During that entire time, his CMKA job title was Asset Protection Agent and his AWG job title never changed from Desk Officer/EMT. While plaintiff received one day of training for the EMT/Patrol Officer position, he never worked in that position during his time at the AWG facility.  He worked only as a Desk Officer.

While plaintiff worked at CMKA, most CMKA on-call employees were assigned a specific post at a specific location.  But the assignment could change.  A majority of CMKA's on-call employees working in a security guard role had a designated place to go for their weekly work.  They usually reported to the same location, but that location changed at times.  CMKA

provided unarmed security officers to four or five businesses other than AWG. They included Aberdeen Village, Notre Dame de Sion, and St. Paul School. Aberdeen Village was a retirement community located in Olathe, Kansas, that provided retirement and hospital-type services, including three different levels of progressive care. Two CMKA on-call employees staffed the Aberdeen Village assignment, though they worked different shifts. Only one CMKA employee at a time would actually work at the location. In 2014, CMKA believed one of the on-call employees assigned to Aberdeen Village would be leaving and thus create an open position there. So when plaintiff became unhappy with his duties at AWG and AWG was unhappy with his performance, CMKA considered moving plaintiff to that potential opening. But ultimately, the position never opened.

In 2014, Mr. Smith was CMKA's Chief Operating Officer ("COO") and Vice President of Operations. Mr. Harper served as its Operations Manager, and he was plaintiff's direct supervisor. Ms. Threadgill worked as a Case Manager in the Protective Services department and she was another of plaintiff's supervisors.

### a.    Duties

Asset Protection Agents worked three different shifts at AWG: midnight to 8:00 a.m.; 8:00 a.m. to 4:00 p.m.; and 4:00 p.m. to midnight. AWG employee shifts were slightly different; their shifts started 30 minutes earlier because they were scheduled for a 30-minute lunch. Plaintiff generally worked an overnight shift (midnight to 8:00 a.m.). Normally, there only were two IT employees in the building during this shift. Plaintiff explained that if he had a seizure they would not be able to help until after the seizure had subsided and he called them.

The essential functions of AWG positions—for both AWG employees and CMKA Asset Protection Agents assigned to AWG—were identified by the individual departments and their

hiring managers. AWG did not require each department to list out the essential functions of each job.

### i.    EMT/Patrol

Mr. Burke—AWG's Senior Manager for Corporate Security—listed the essential functions of the AWG EMT/Patrol Officer position in 2014 as:  conducting patrols by vehicle and on foot of the entire AWG facility (including another building down the street); and handling medical calls at any of those facilities.[13]  The patrol duties included checking parking lots, and foot patrols of the corporate office, another building, and the warehouse.  Mr. Burke identified other essential functions of the EMT/Patrol Officer position as:  performing drug screens; handling post-accident drug and alcohol screens; assisting the Desk Officers (giving them breaks and thus requiring cross-training on Desk Officer duties); checking fire extinguishers in the corporate building; assisting with conducting preemployment background checks; monitoring cameras; accessing control; checking emergency lights and doors; responding to alarms; and performing floor and door checks.

Mr. Burke explained that AWG required its EMT/Patrol Officers to drive motor vehicles because the AWG warehouse facility is a million square feet that occupies more than 40 acres of land.  And AWG required EMT/Patrol Officers to patrol that entire facility.  Also, EMT/Patrol Officers could access another facility that they had to patrol only by driving on public roads.  Finally, EMT/Patrol Officers may have to take someone to a medical clinic.  This function required an ability to drive on public roads.  Conversely, Mr. Harper—CMKA's Operations

---

[13]    The AWG campus has traffic from common carriers, contractors, and vendors.  This traffic includes tractor-trailers carrying 80,000-pound rigs.  AWG bans bicycles for safety reasons, except in employee parking lots.  The AWG warehouse is a 24/7 operation, with trucks coming and going at all hours. Plaintiff estimates that the entire facility covers 10–12 city blocks.

Manager—believed that the only purpose for the EMT driving a motor vehicle was to respond to a medical call as quickly as possible.

While the number of medical calls in a typical week requiring the EMT/Patrol Officer to respond varied from week-to-week, the number of calls had reached as many as 10 in one week. The only means of transportation to respond to medical calls that were far away on AWG's campus was by using an AWG patrol vehicle.

Plaintiff agreed that the primary duties of the EMT/Patrol Officer required him to provide EMT assistance as needed while working at the front desk, alone during the night shift, or when patrolling the area in a client vehicle. Plaintiff also agreed that driving was an essential function of the EMT position.

From March 2014 through at least August 2014, AWG did not have 24/7 EMT coverage at its Kansas City, Kansas location.

Before plaintiff began his assignment at AWG, he was certified as a medical first responder and had learned skills like taking blood pressure, monitoring heart rates, setting splints, and performing other general emergency medical skills. The only training he needed to receive at AWG about EMT services were AWG's specific protocols, where AWG kept equipment, and related knowledge.

### ii.    Desk Officer

The essential functions of the Desk Officer position included sitting at the front desk of AWG's corporate office, answering phones, transferring calls to the proper divisions after hours, monitoring cameras, accessing control, conducting preemployment background screens, and conducting floor and door checks. The Desk Officer also was responsible for tracking who was in the building in case of emergency.

The floor check and door check job duties included checking certain offices on each floor to ensure they were locked.  During the floor and door checks, Desk Officers were supposed to check offices for lights that were left on, leaking water pipes, and to ensure generally that "everything was in order."  Doc. 180-12 at 9 (Burke Dep. 54:17–19).  During these checks, Desk Officers also ensured that all individuals in the building were logged into the computer system. AWG required every Desk Officer to perform floor and door checks at least once per shift—even when the outgoing officer had performed a floor and door check right before leaving.  The only Desk Officers exempt from performing these checks were the ones assigned to the day shift during the work week.  Unlike EMT/Patrol Officers, Desk Officers were not required to drive cars.

AWG provided plaintiff with just two types of training about the front desk duties.  They were:  which websites to use to conduct background checks on individuals applying for work at one of AWG's member's facilities; and what areas of the building to monitor using the video monitors located at the front desk.  Amber Morlan—an AWG employee—showed plaintiff how to perform the background check portion of his duties.  Plaintiff already knew how to use the computer, view a computer monitor, and fill out a report.

The security officer position at the Guard Shack was a different position than either the Desk Officer or EMT/Patrol Officer role.  Plaintiff never worked in the Guard Shack and was not interested in working in that position.

### iii.    Daily Activity Reports and Post Orders

Asset Protection Agents were required to fill out Daily Activity Reports for each shift they worked.  They were required to complete this report fully.  The Daily Activity Report included a section at the bottom entitled *Chronological Patrol Log*.  If something unusual

occurred, or there was suspicious activity (*i.e.*, they deactivated a badge or the police or an ambulance was called) the Desk Officer was required to note that event in this portion of the report. And before plaintiff was removed from AWG, Mr. Burke had instructed the Asset Protection Agents to note on their Patrol Log when they had conducted their floor rounds.

Desk Officers were not required to list each office that they checked during their floor checks on the Daily Activity Report. But if an office that was supposed to be locked was found unlocked, the Desk Officer needed to note that on his Daily Activity Report. Desk Officers were also required to notify Mr. Burke and Mark Hulett—AWG's Kansas City Security Supervisor— if they found any office unlocked.

Besides orientation that trained Asset Protection Agents on how to perform the job duties, there were also "post orders" and emails that provided the agents with guidance. Post orders outlined specific duties, policies, or procedures for a particular department or job description. They constituted the reference manual, which Desk Officers used to learn and understand what they were supposed to do. The post orders also explained how individuals were to perform their job functions. In 2014, the Security Department post orders were kept at the front desk (for the Desk Officers) and in the Security office (for the EMT/Patrol Officers).

While CMKA had a right under the Agreement to be consulted about the post orders, in practice, AWG created them. CMKA could review the post orders and notify AWG of any concerns. But, Mr. Harper didn't remember CMKA asking to make any changes to post orders so he could not answer definitely whether AWG would have made those changes. Mr. Harper believed that AWG had the final approval authority on post orders.

35

### b.     Schedule, Job Duties, and Discipline

On occasion, AWG requested plaintiff to work certain hours.  But generally, CMKA assigned plaintiff his work hours.  Mr. Harper explained that he was involved in some of the scheduling of CMKA personnel assigned to AWG.

On March 31, 2014, plaintiff emailed Mr. Harper about a 16-hour shift he was scheduled to work.  Mr. Harper responded, "Jerry [Burke] brought that to my attention.  I will adjust." Doc. 60-10 at 7.  Mr. Burke explained:

> Jeff Harper created the schedules for assigned Asset Protection Agents. Occasionally, when AWG Security Supervisor Mark Hulett ("Hulett") or I would notice mistakes in the schedules for services to be provided (for example, if a single [CMKA] employee was assigned to work sixteen hours consecutively), one of us would tell Harper so he could make necessary adjustments to provide appropriate coverage as he would determine.  If it was more efficient, Hulett or I might adjust the scheduled coverage ourselves and then inform Harper who would make the determination about the assignment.

Doc. 67-1 at 3.

Generally, when plaintiff had questions about his hours, his schedule, or his job duties, he communicated with CMKA employees.  AWG employees might mention information about how to dress, meetings, or similar topics but, generally, plaintiff expected to receive this kind of information from CMKA.

Generally, CMKA disciplined plaintiff; AWG had no power to discipline or evaluate the performance of Asset Protection Agents.  When AWG had concerns about plaintiff's appearance or performance, they communicated those concerns to CMKA, who corrected plaintiff.  For example, plaintiff wore his CMKA uniform, bearing a CMKA logo, while on AWG's premises. But when plaintiff failed to wear a belt, Mr. Burke informed Mr. Harper, who then told plaintiff to wear a belt so he could present a professional image.  But occasionally, AWG sent reminders

directly to plaintiff and other CMKA employees.  Specifically, Mr. Burke once reminded the front desk officers to conduct door checks and turn off lights.

### 6.    Dress Code and Performance Issues

Within a week of beginning his employment with CMKA and assignment at AWG, plaintiff had dress code issues.  On March 10, 2014, Mr. Harper emailed plaintiff reminding him to dress appropriately, *i.e.*, that he was expected to "[d]ress kind of business casual type."  Doc. 180-18.  On March 18, 2014, Mr. Harper again emailed plaintiff about his appearance—he should wear a belt—and directing him to "sit up" at the AWG front desk.  Doc. 180-19.  Two days later, Mr. Harper again sent plaintiff an email about the dress code.  He also addressed front desk performance issues.  Specifically, he asked plaintiff to run as many background checks as possible while stationed at the front desk.  He also reminded him to promptly answer the phone. The phone rang—unanswered—for 2–3 minutes during one of plaintiff's shifts.

Around this same time in March 2014, plaintiff became frustrated with the computer at the front desk and he banged the keyboard on the desk.  Mr. Burke was located nearby and he helped plaintiff resolve the computer issue.  Mr. Burke also spoke to plaintiff about banging the keyboard on the AWG front desk, explaining that it was unacceptable behavior.

At the end of March and through April 2014, Mr. Burke sent plaintiff several emails.  On March 31, 2014, he sent one advising plaintiff that he was coding store entries incorrectly.  This message also provided plaintiff some tips for handling individual background checks.  On April 16, 2014, Mr. Burke sent plaintiff a message advising him that he needed to remember to check women's maiden names when performing the background checks to ensure accurate results.  On April 24, 2014, Mr. Burke sent plaintiff and another CMKA employee, Esther Zimmerman, a message asking them to use the attachment to the email as a model when entering store numbers. And on April 27, 2014, Mr. Burke sent a message to plaintiff advising that he needed to record in

PassagePoint (AWG's software system) everyone who entered the AWG building after normal hours. Plaintiff acknowledged that he had not done so and explained that it was hard for him to keep up because he did not know all the faces of the people who come into the building.

### 7. April/May 2014 Seizure

In late April or early May 2014, plaintiff experienced another seizure at home. Plaintiff did not disclose this seizure to anyone at CMKA or AWG. Plaintiff explained that someone told him that until an employer witnessed one of his seizures, it is none of their concern and so, plaintiff believed he could disclose his seizure at his discretion. Plaintiff did not tell anyone at AWG or CMKA that he was not supposed to be driving or working alone for six months following the seizure. By this point in time, CMKA had not given plaintiff any reason to believe it would have treated him differently had he disclosed his medical condition.

### 8. Continued Performance Issues and Plaintiff's Unhappiness

Throughout May and June 2014, plaintiff continued to experience performance issues. On May 5, 2014, Mr. Burke sent plaintiff an email telling him that when performing background checks, he needed to run a data facts report when the Missouri case.net website search did not show any convictions.

Overall, AWG was unhappy with plaintiff's appearance and performance, and CMKA began looking for a new job location for plaintiff. CMKA told AWG about its intention to seek a new location for plaintiff. Specifically, on May 23, 2014, Mr. Smith informed Mr. Burke by email that CMKA was "taking a hard look at [plaintiff] and thinking proactively about a possible move there." Doc. 209-13 at 2. He promised to "get back to [Mr. Burke] shortly on that." *Id.* CMKA wanted to "study the options first." *Id.*

Around this same time, plaintiff was upset and frustrated that he had not been able to perform the EMT functions of the work assignment at AWG. When plaintiff began his

assignment at AWG, he was anxious to begin working in the EMT/Patrol Officer position, rather than the front desk position. But CMKA informed him that it was more important to cover the front desk position. Plaintiff made it clear to CMKA that he wanted to perform the EMT functions of the position at AWG and wanted an EMT position, if possible. The reason he applied for the CMKA/AWG position was because of the EMT work and he would not be happy in his CMKA role if he worked in the security guard position only. Plaintiff was disappointed that his placement in the EMT position was delayed repeatedly.

On May 29, 2014, plaintiff sent an email to Mr. Harper expressing frustration that he had not been trained on the EMT/Patrol Officer position yet. Plaintiff also asked whether there were any other EMT positions available at other CMKA clients. Mr. Harper explained to him that AWG was the only CMKA client that had EMT positions and that AWG was responsible for the delay in his training. After several messages back and forth, Mr. Harper responded that "the bottom line is that this is what the client wanted to do and they pay us so we as a company have to do that." Doc. 180-28 at 1. Mr. Harper believed plaintiff was not happy with the front desk position and he wanted to move to a different one, if possible.[14]

Around the beginning of June 2014, AWG decided to reduce the number of weekly hours CMKA need to staff the EMT/Patrol Officer position; the weekly hours were reduced from 56 hours per week to 16 hours per week and as needed to cover any vacation taken by Mr. Hulett. AWG had designated Ms. Morlan from AWG to cover the 40 hours that resulted in the reduction. And then AWG needed someone to backfill her desk job.

---

[14]    While employed by CMKA, plaintiff continued to apply for positions where he could use his EMT skills.

Plaintiff continued to have performance issues.  On June 12, 2014, Mr. Burke sent plaintiff a second email with the store number reference sheet because he continued to enter the store numbers into the background database improperly.  That same day, Mr. Burke sent plaintiff another email instructing him how to run background checks properly to avoid charging a store twice for the same background check.  Against procedure, plaintiff had run a second background check on an applicant within 30 days of the first check of that applicant.

On June 16, 2014, Mr. Burke sent an email to plaintiff and other individuals working the Desk Officer position.  This message advised the recipients that they had to perform their floor and door checks on every shift.  Also, he reminded them:

> [A]fter City Wide[15] has left it is the responsibility of the incoming desk officer or the desk officer leaving to make a round in the building and check that the doors that need to be locked are locked, and the lights upstairs and in certain areas on the first floor are turned off.

Doc. 180-31 (footnote added).  At the time plaintiff received this email, he knew that he must check—whether he was the incoming or outgoing security guard—the referenced doors.  Plaintiff also understood which doors he needed to checked, and he was not confused about which offices he needed to check.

On June 17, 2014, Ms. Threadgill sent plaintiff an email asking him why he was recording extra time on his shift.  Plaintiff responded that he was taking extra time because it

---

[15]     City Wide was the cleaning company that AWG used in 2014.  They provided services like cleaning, vacuuming, dusting desks, emptying trash, and cleaning bathrooms.  In 2014, City Wide typically performed their cleaning services at AWG Monday through Friday and began arriving there about 4:00 p.m.  Depending on how much work the City Wide employees had to do, they left between 9:00 p.m. and midnight.

allowed CMKA employee Jamie Phiakeo to go and turn out lights and lock doors. He explained that AWG had "kinda been getting on to [them] about" locking doors and turning off lights. Doc. 180-32.

If Mr. Burke or the Desk Officer who relieved him asked plaintiff about doors being unlocked, he told them, "[I]f the doors were left open someone else left them open or didn't check them." Doc. 180-1 at 24 (Crumpley Dep. 113:13–23).

### 9.    June 25, 2014 seizure

On June 25, 2014, plaintiff began his orientation and training for the EMT/Patrol Officer position. During the training, plaintiff experienced a seizure while he was located at AWG's facility in Kansas City, Kansas. AWG employees assisted plaintiff when he experienced this seizure. Mr. Hulett filled out an incident report about it. He also signed as a witness on plaintiff's Release from Responsibility. The release certified that plaintiff had refused transportation against the advice of the EMT and AWG. When Mr. Hulett signed this release, he noted his relationship to plaintiff as "supervisor." Doc. 65-2 at 2. Mr. Hulett's title at AWG was Security Supervisor.

Shortly after he experienced this seizure, plaintiff disclosed to Mr. Hulett and Mr. Burke for the first time that he had a history of seizures. Then, Mr. Burke called Mr. Harper and told him that plaintiff had experienced a seizure participating in training at AWG. AWG had called for an ambulance, but plaintiff refused treatment. Mr. Burke told Mr. Harper that they were going to take plaintiff to the front office and Mr. Harper could call plaintiff there. Mr. Harper spoke with plaintiff to determine whether he was alright. Before June 25, 2014, CMKA and AWG did not know about plaintiff's medical condition.

After his seizure, plaintiff requested the rest of the day off to recover.  CMKA granted his request.  Plaintiff did not request any other accommodations from CMKA.  Plaintiff also does not recall discussing accommodations with AWG.

After the June 25 seizure and plaintiff's disclosure that he had a history of seizures, AWG developed concerns about plaintiff's health and wellbeing, and his ability to perform the Desk Officer and EMT/Patrol Officer positions safely.  Specifically, AWG had concerns about plaintiff potentially having another seizure while he was driving an AWG vehicle or administering medical attention on an EMT call.  AWG was concerned that either situation could pose safety issues for plaintiff and others.  Also, AWG had concerns that if plaintiff had a seizure during the evening or overnight shifts that he frequently worked as a Desk Officer, there were not many people in the building with him, so if plaintiff could not get immediate medical attention that, too, could present a safety risk.

AWG first raised these concerns on June 25, when Mr. Burke discussed them with Mr. Hulett.  AWG later expressed its concerns to Mr. Harper and Mr. Smith at CMKA.  CMKA shared AWG's concerns about plaintiff's ability to perform the job functions safely.

Within a few days of his June 25 seizure, plaintiff spoke with Mr. Harper.  He asked, "I'm not going to lose my job because of this?"  and "I'm not going to be impacted by this in anyway?"  (plaintiff clarified that "this" meant his medical condition).  Doc. 198-4 at 12 (Crumpley Dep. 74:10–17).

Plaintiff repeatedly asked Mr. Harper when he would resume his normal schedule of patrols.  Around the end of June or beginning of July 2014, plaintiff again began work at AWG in the same Desk Officer position he occupied before his June 25 seizure.  Plaintiff agrees that there was no significant deviation in the number of hours he worked after the seizure compared

with his hours he worked before that seizure. His average hours per week dropped from 34 to 29. Plaintiff does not claim that he was treated differently in his work as the front desk officer after his seizure. Plaintiff never had worked an EMT shift or any shift that required driving before his June 25, 2014 seizure.

After plaintiff's period of convalescence from his June 25 seizure, Mr. Harper asked him to obtain a signed medical release from his doctor. Around July 1, 2014, CMKA received an unsigned medical release from plaintiff's family practice physician, Dr. Ferguson. Plaintiff cannot recall whether he told Dr. Ferguson what his job duties were before Dr. Ferguson's office provided plaintiff an unsigned release. CMKA contacted plaintiff to explain that they needed a signed medical release. Plaintiff said he understood and contacted his physician to secure the signed release.

No decision about plaintiff's status on the EMT/Patrol Officer position had been made before July 1, 2014. But, Mr. Burke explained that CMKA later decided, and he agreed, that plaintiff's EMT/Patrol Officer orientation and training would end. When asked if plaintiff ever completed his EMT training, Mr. Harper did not know, but he thought Mr. Burke or Mr. Hulett would know. Mr. Harper explained that AWG sometimes updated him about the status of plaintiff's training.

Around July 1, 2014, Mr. Harper spoke with Mr. Burke and Mr. Hulett about the legal requirements for driving after a seizure, *i.e.*, no driving within six months of a seizure. As former police officers, these three individuals knew about this requirement for persons who had experienced a seizure. Mr. Burke raised this issue first. AWG Senior Insurance Manager Tom Burchett believed plaintiff could not, or should not, drive an AWG motor vehicle based on Kansas law. He told Mr. Burke about his concern.

43

On July 15, 2014, Mr. Burke requested and arranged a meeting with Mr. Hulett and Mr. Harper.  During this meeting, they discussed:  concerns about plaintiff's operation of an AWG motor vehicle, and the safety of plaintiff and others; the status of plaintiff's unsigned medical release; other potential positions for plaintiff based on Mr. Smith's May 23, 2014 email and other statements that CMKA was looking to move plaintiff to another position; status on the possible Aberdeen opening in Olathe; the agreed decision that plaintiff would remain in the Desk Officer position until the medical release issues were resolved; AWG's thoughts about a possible panic button at the front desk; and AWG's intention to have some of the IT employees check on plaintiff during his Desk Officer shifts to ensure he was alright.  On July 18, 2014, Mr. Hulett sent Mr. Burke an email memorializing their meeting with Mr. Harper.  In this email, Mr. Hulett wrote, "Mr. Burke was very clear in each of these discussions that he did not want [plaintiff] to lose his job based on his medical condition because as previously stated it was not an issue for AWG."  Doc. 180-41.

After the July 15, 2014 meeting, plaintiff's hours, shifts, and his work environment remained the same.  And he performed the same duties he had performed before his June 25 seizure.  But, for plaintiff's safety, AWG had IT employees check on plaintiff periodically throughout his Desk Officer shifts.

On July 29, 2014, plaintiff had an appointment with Dr. Ferguson.  They discussed his June 25 seizure.  Plaintiff cannot recall if he told Dr. Ferguson that day or any time before what his job duties were.  He also cannot recall whether he told Dr. Ferguson that he would need to drive a vehicle around the AWG facility, how often he would drive, or at what speeds he would drive.  But Dr. Ferguson understood, from information plaintiff had provided him, that plaintiff might drive a small amount on AWG's private property.  Dr. Ferguson believed that plaintiff

spent a majority of his time at work walking. So, Dr. Ferguson believed it was safe for plaintiff to drive because no one else was around that he could injure. In short, he told plaintiff he was okay with plaintiff driving at speeds of 30 mph around the AWG facility perimeter if his employer allowed it. But he did not want plaintiff driving on any regular highway or anyplace else.[16]

That same day, plaintiff informed Mr. Harper that he had a signed medical release and would fax it to Mr. Harper. Both AWG and CMKA had concerns about the medical release because it merely permitted plaintiff to drive around the perimeter of the property. The EMT/Patrol Officer position required more driving than the release approved. And it was their understanding that the law required a six-month seizure free period before an individual could drive a vehicle.

AWG relied on CMKA for information about plaintiff's ability to perform his assignment safely. AWG never requested or required plaintiff to submit medical documentation to AWG about his fitness for duty or ability to return to work. Nor did AWG receive any medical documentation from CMKA or plaintiff. Plaintiff does not recall anyone at AWG ever telling him he needed a release to return to work, nor does he know if anyone at CMKA ever provided any physician's notes to AWG. After his seizure, plaintiff never had any conversations with any AWG employees about his ability to drive. Other than a conversation with AWG employees immediately after his seizure on June 25, plaintiff does not recall ever discussing his medical condition with any AWG employees.

---

[16]    Dr. Ferguson was not convinced that plaintiff's June 25 episode was a full-blown seizure. It only lasted 45 seconds and plaintiff was hot, he hadn't eaten, and he was overworked. So even though plaintiff called it a seizure, Dr. Ferguson wasn't comfortable referring to it as a seizure.

### 10. Daily Activity Reports and Floor and Door Checks

Throughout July 2014, Mr. Burke and Mr. Harper sent several emails to the Asset Protection Agents.  On July 7, 2014, Mr. Burke sent one informing the Asset Protection Agents that he had not been receiving Daily Activity Reports for each shift.  Mr. Burke also advised the Asset Protection Agents that they needed to complete a Daily Activity Report for every shift.  On July 14, 2014, Mr. Burke sent another message to them.  It stressed that they must check the doors on every shift.  If the doors were unlocked, they needed to lock them and then report the situation to Mr. Hulett and Mr. Burke.

On July 15, 2014, AWG issued a new post order identifying the offices that must be checked once each shift.  That same day, Mr. Burke sent an email to the Asset Protection Agents, forwarding the prior email about checking doors/offices and providing a copy of the post order.

The next day, July 16, Mr. Burke sent an email to the Asset Protection Agents to remind them that when no EMT/Patrol Officer was on duty, the Desk Officers were responsible to check doors and turn off the lights.  The email also listed which offices they must check.  That same day, Mr. Harper also sent an email to the Asset Protection Agents about internet usage.  Specifically, Mr. Harper admonished the employees for visiting pornographic sites.  He explained that AWG monitored the internet usage and if any of them visited a website that registered as pornography, Mr. Burke would investigate it.  Also that same day, Mr. Harper instructed the Asset Protection Agents to perform floor checks when IT employees relieved them for breaks.  Mr. Harper wanted the Asset Protection Agents to use these breaks rather than arrive early to do the floor checks at the beginning of the shift or stay late to do them at the end.  Mr. Harper explained, "This will eliminate the [overtime].  I spoke to Jerry [Burke] about this."  Doc. 65-13 at 2.  Mr. Harper also directed that when they found doors unlocked, they should lock them, and then notify Mr. Burke or Mr. Hulett in an email to address the situation.  In plaintiff's

experience, using IT employees to do floor checks during breaks was not a good option because it took IT 60–90 minutes to respond when plaintiff contacted them about taking a break.

Plaintiff admits that he was reminded on multiple occasions about the need to perform floor checks. He also admits that, on multiple occasions between June 2014 and August 2014, he never went to the third floor to perform door checks there. He also agrees that "more often than not" he failed to perform the required checks. Doc. 183-2 at 146 (Crumpley Dep. 365:4–6).

### 11. Removal from AWG

At 5:33 a.m. on August 15, 2014, Ms. Morlan—an AWG employee—sent an email to Mr. Burke and Mr. Hulett informing them that the Human Resources office doors were open and unlocked when she arrived for her shift. After receiving Ms. Morlan's email, Mr. Burke checked plaintiff's Daily Activity Logs. After checking plaintiff's logs, it appeared that plaintiff made all proper rounds. Mr. Burke also ran a badge swipe search on plaintiff and the other Desk Officers to see if they had been performing their floor checks. The badge swipe records showed that plaintiff rarely performed his floor checks and that he had not been to the second or third floor of the AWG corporate building (required to conduct a proper floor check) on 34 of his 43 shifts during June (before his seizure incident), July, and the first half of August 2014. This was a serious concern for AWG.

Plaintiff agrees that he had not checked the third floor on several dates. Indeed, plaintiff acknowledges that he had not been on the third floor on 79 percent of his assigned days between June and August 2014. He also agreed that this failure was a significant performance issue. Plaintiff explained that, at times, he decided not follow the directive to check the doors because it required him to leave the desk, which he was required to staff.

Mr. Burke checked everyone's badge swipes once plaintiff's performance issues came to light. He learned that other CMKA employees were not performing their floor checks either.

But, Mr. Burke did not believe these other employees' performance issues had occurred to the same extent as plaintiff during August 2014.

After reviewing plaintiff's badge swipe records, Mr. Burke asked Mr. Hulett to contact Mr. Harper and report that plaintiff was not performing his required rounds. At 7:55 a.m. on August 15, 2014, Mr. Hulett sent the requested email. It explained:

> The overnite desk officer found 2 HR doors open on one of her rounds last night. These 2 offices are never to be left open. I need to know from [plaintiff] what time City Wide left and if it was before the end of his shift why he did not see these doors open and did not secure them.

Doc. 180-44. Thirty minutes later, in response to Mr. Hulett's email, Mr. Burke sent an email to Mr. Harper asking Mr. Harper to call him before calling plaintiff.

Later that morning, Mr. Burke had a phone conversation with Mr. Harper about plaintiff's failure to perform his door checks, the badge swipe records, and AWG's concerns. Specifically, Mr. Burke told Mr. Harper that plaintiff's failure to perform his floor checks was "a huge problem" for AWG. Doc. 180-12 at 15 (Burke Dep. 97:19–24). Mr. Harper specifically asked Mr. Burke if he had checked the badge swipe records for other CMKA employees. Mr. Burke confirmed he had. Plaintiff's medical condition was not discussed or mentioned in these phone call or emails between Mr. Harper and Mr. Burke.

Mr. Harper believed that AWG had directed CMKA to terminate plaintiff's placement at AWG and he followed that directive. Neither Mr. Burke nor Mr. Hulett ever said anything to Mr. Harper suggesting that AWG wanted plaintiff removed from the AWG assignment because he had a seizure or because of any medical condition. Also, Mr. Burke never said anything to Mr. Harper suggesting that plaintiff's medical condition was an issue for AWG. AWG made it "pretty darn clear" to CMKA that they had concerns about plaintiff's job performance. Doc. 180-7 at 15 (Smith Dep. 162:10–12).

Conversely, Mr. Burke said that CMKA made the decision to remove plaintiff from the AWG Desk Officer position, AWG did not request it. But, Mr. Burke was not disappointed by this decision and, ultimately, AWG agreed with the decision because of plaintiff's various performance issues—specifically, his failure to conduct floor checks. Mr. Burke believed that, if AWG had employed plaintiff, plaintiff's performance issues were sufficient cause to terminate his employment.

Immediately after Mr. Harper's call with Mr. Burke, Mr. Harper told Ms. Threadgill that he was going to remove plaintiff from the AWG site because Mr. Burke had told him AWG did not want plaintiff to come back. Mr. Harper also told her that he was trying to find another location for plaintiff to work. Ms. Threadgill believed that Mr. Harper was looking for both EMT and non-EMT positions for plaintiff.

At 9:32 a.m. on August 15, 2014, Mr. Harper sent an email to plaintiff about door checks and making rounds: "I spoke with Jerry [Burke] this morning and you have not been checking doors like you are supposed [to do]. My question to you is WHY? Jerry [Burke] has checked the card swipe and you have not been up there in a while. I need an answer." Doc. 180-46.

About half an hour earlier, at 9:00 a.m. on August 15, 2014, Mr. Burke sent an email to Ms. Morlan. It instructed her as follows: "When you come in tonight please send Mark [Hulett] and I an email about your conversation with [plaintiff] last night regarding what he told you when he makes rounds to check doors." Doc. 180-45. Just after midnight, Ms. Morlan sent an email to Mr. Hulett and Mr. Burke. She explained her conversation with plaintiff in that email:

> Last night I arrived at approximately 2330 hours and since City Wide had left prior to my arrival, I went to make rounds and check doors. This is when I found Corp HR doors unlocked. [Plaintiff] informed me that he had not made his rounds yet, he was waiting for City Wide to leave. He informed me that he usually does not make his rounds until [] before his shift is over. This is popular sometimes among whomever is on evening shift, as City Wide is usually here until 2330–0000

cleaning still. I am not sure about when [plaintiff] checks doors and makes his walk-thrus on the weekends or overnight shifts.

Doc. 180-47.

Both Mr. Burke and Mr. Hulett told the Desk Officers that they were required to perform their floor checks as soon as possible after City Wide left. This was crucial based on the type of information and documents maintained in these offices. Plaintiff understood during the time he worked for CMKA that performing door checks was an important function of his job as a security guard.

On August 19, 2014, Mr. Harper sent an email to Erin Neuberger at Cobalt Astra—an agency providing Human Resources services to CMKA. This email sought advice about how to remove plaintiff from the AWG assignment. He asked: "I am letting [plaintiff] go Friday, this is the guy who had the seizure and his doctor cleared him. He works at Associated Wholesale Grocers and they do not want him on property any more. What would be the best way to go about this." Doc. 180-48. The next day, Mr. Harper sent an email to Mr. Burke and Mr. Hulett explaining:

> I spoke with our H.R. and I will be bring[ing] [plaintiff] in Friday for his termination,[17] did Amber [Morlan] write a report on him telling the truth?[18] Would I be able to get a copy or an email on the details for our files by chance? If not I completely understand. I just wanted to put it in his personal [sic] file.

Doc. 180-49 (footnotes added).

On August 21, 2014, Mr. Harper sent plaintiff an email saying that he needed to talk to plaintiff the next day by phone or at the office. Twenty minutes later, plaintiff responded that he

---

[17]   Mr. Harper testified that he meant the word "termination" to describe plaintiff's removal from the assignment to AWG. Doc. 180-8 at 19–20 (Harper Dep. 164:21–165:1).

[18]   Mr. Harper referenced "telling the truth" because Mr. Burke or Mr. Hulett had told him at some point that plaintiff had said he was doing his door checks. Yet they had discovered he was not. *Id.* at 20 (165:12–16).

was available by phone.  Mr. Harper called plaintiff and told him that he was being removed from the AWG assignment because the contract had changed, explaining that AWG was reducing the number of security personnel.  Mr. Harper later said that he was trying to "be nice" to plaintiff by not telling him he was removed for performance issues when that was the true reason he was removed.  Doc. 180-8 at 22 (Harper Dep. 173:21–23).

CMKA was looking to place plaintiff in another position with Aberdeen Village in Olathe, Kansas.  Mr. Harper thought one of its guards was leaving and that the contract would be renegotiated to include a raise.  Mr. Harper thought the prospective Aberdeen position would allow plaintiff to use his EMT training.  Mr. Harper communicated his thoughts about the Aberdeen position to plaintiff during the August 21 phone call.

After this phone call, plaintiff and Mr. Harper exchanged several emails.  First, plaintiff asked, "Just so we're clear, this has nothing to do with my medical history right?"  Doc. 180-51 at 1.  Mr. Harper responded, "No it does not."  *Id.* at 2.  Plaintiff then sent another email asking, "Jeff what is the REAL reason I was released.  I deserve to know.  I know its not because of the reason you told me because I just found the EXACT SAME posting I responded to originally on Craigslist and it was only posted 2hrs ago.  Is there even a position [at Aberdeen]?"  Mr. Harper responded, "Yes there is a position [at Aberdeen]."  *Id.* at 2.[19]

Later, Mr. Harper told plaintiff that AWG had requested his removal.  According to Mr. Smith, CMKA's COO, plaintiff was removed from the AWG assignment on August 21, 2014 because he didn't do his job properly.  He said that plaintiff's seizure was discussed, "they tried to make it fit at the front desk, and then his job performance wasn't good enough to stay."  Doc. 176-1 at 12 (Smith Dep. 131:12–19).  Plaintiff was not terminated by CMKA at that time.

---

[19]    In 2014, CMKA constantly was interviewing candidates for positions at AWG, particularly for the EMT/Patrol Officer position.

On October 7, 2014, Mr. Smith sent an email expressing his opinion why plaintiff was removed from AWG.  Mr. Smith explained that plaintiff "periodically passes out," "his duties included driving an AWG vehicle," and "he worked the night shift at the lobby desk where very few people enter."  So Mr. Smith said CMKA had "[n]o choice."  He also added "the customer, AWG didn't want that liability for their sake of his own [sic]."  Doc. 65-11.  When asked if anyone had ever told him that plaintiff was removed from AWG due to liability concerns, Mr. Smith said that they had not.

Since his last day on the AWG jobsite, plaintiff never has spoken with an AWG employee.

### 12.    Alleged Termination from CMKA

Several weeks after plaintiff was removed from AWG, Ms. Threadgill had not heard from plaintiff.  So she contacted him about bringing in his uniforms and picking up his final check.  She did not speak with Mr. Harper before making this phone call.  While she was on the phone with plaintiff, Mr. Harper overheard the conversation and interrupted her, telling her that plaintiff did not need to turn in his uniforms because Mr. Harper was still trying to find work for him.  Ms. Threadgill relayed this information to plaintiff.

Mr. Harper never told plaintiff he was terminated from his employment with CMKA.  He explicitly told plaintiff that he still was considered a CMKA employee, but they simply did not have any job assignments for plaintiff at that time.

Sometime after this phone call between plaintiff and Ms. Threadgill, plaintiff brought in his uniforms, spoke briefly with Ms. Threadgill, and picked up his paycheck.  Ms. Threadgill accepted the uniforms and did not ask him any questions.  Plaintiff did not tell Ms. Threadgill why he was turning in the uniforms.  He later explained that he returned his uniforms because Ms. Threadgill told him to bring them in and pick up his final check.  Although Ms. Threadgill

never specifically told him his employment at CMKA was terminated, plaintiff interpreted her request for his uniforms and for him to pick up his final check as an indication he was terminated.

Mr. Harper believed that plaintiff voluntarily resigned his employment when he returned his uniforms to CMKA after being told that CMKA was still trying to find him work. Ms. Threadgill does not believe Mr. Harper terminated plaintiff's employment. Mr. Smith said that he would defer to Mr. Harper about whether plaintiff ultimately was terminated from CMKA's employment. It was Mr. Smith's belief that plaintiff was still an on-call employee and would be contacted by CMKA if an opportunity came up—though one never did.

Under the CMKA Employee Handbook, plaintiff could have appealed any termination from employment. But he did not take an appeal.

Plaintiff concedes that he signed off on the Daily Activity Logs reporting that he conducted floor and door checks even though he did not. He agrees that he was, in essence, falsifying records and being untruthful with CMKA during his employment there. He also agrees that this represented a serious performance issue. Plaintiff concedes that by falsifying records and failing to perform his door checks at CMKA, he exhibited untrustworthiness, and therefore lacked one of the skills referenced in the job posting. Plaintiff also agrees that trustworthiness was an important required skill for a security guard because his responsibilities included checking offices, where AWG kept important documents, and securing the facility. He concedes that trustworthiness was more important than other skills, such as physical conditioning and appearance. Plaintiff also concedes that by falsifying records, he violated one of the rules in CMKA's Employee Handbook. This Handbook references falsification of records in the "Causes for Termination" section and recites that such conduct may provide for immediate

termination from employment.  Plaintiff does not contend that the performance issues cited by
CMKA are fabricated.  Plaintiff agrees that, based on CMKA's Employee Handbook and the
significant performance issues he had, CMKA had legitimate grounds to terminate his
employment had they wanted to do so.

Plaintiff applied for unemployment after leaving his employment from CMKA.  On the
application, he named CMKA as his employer, but he did not include AWG as his employer.
Also, plaintiff's LinkedIn resume shows that he worked for CMKA and that AWG was CMKA's
client.  The resume does assert that he worked at an AWG location.

### 13.    Discrimination

Before June 25, 2014, plaintiff did not have any concerns about disability discrimination
by CMKA based on his seizure disorder.  Also, plaintiff had no complaints of discrimination or
differential treatment based on the nature of the position that he was given after his June 25,
2014 seizure.  Mr. Harper never made any comments to plaintiff that plaintiff considered to be
derogatory or negative with respect to his medical condition during the time he worked for
CMKA.

Plaintiff did not complain about disability discrimination to Ms. Threadgill in his phone
call with her after his removal from the AWG assignment.  Generally, plaintiff was not unhappy
with the way CMKA treated him while he worked for them.  Plaintiff believed he was
discriminated against, partly, because initially, he incorrectly believed he was removed from the
AWG jobsite just days after his June 25 seizure.  Also, plaintiff believed that if his job
performance had been an issue, it would have been handled before his June 25 seizure.

Plaintiff never reported to Mr. Burke that he felt like he was being treated differently
because of his disability.  Mr. Burke did not receive any reports from anyone who believed

plaintiff was being discriminated against.  Mr. Burke never went to Mr. Harper or Mr. Smith to

raise concerns of discrimination or harassment.

In sum, plaintiff never complained of disability discrimination to CMKA or AWG before

his termination from employment.

### a.    Reasonable Accommodations

The only reasonable accommodation plaintiff ever requested was to take the rest of June

25, 2014, off from work.  CMKA granted that request.  Plaintiff never asked CMKA after June

25, 2014, to engage in a conversation about what else plaintiff might need to accommodate him

to do his job.  And plaintiff never contacted Cobalt Astra, as indicated in the CMKA Employee

Handbook, to request any reasonable accommodation.  In short, CMKA and AWG never

discussed any other accommodations with plaintiff.  And plaintiff could not recall any time that

CMKA or AWG refused to talk with him about possible accommodations.

Plaintiff did not believe he needed any type of accommodation for the work he performed

at AWG.  He believed he could perform the essential functions of the job while employed with

CMKA and AWG.

CMKA never told plaintiff that he was being terminated from his position at AWG or

from his employment with CMKA because of his seizure disorder.

### b.    Similarly Situated Employees and Comparable Conduct

AWG terminated Deborah Miller in 2012 for failing to perform floor checks and

falsifying records.  An issue arose about Ms. Miller taking excessive breaks, so Mr. Burke

looked at her daily reports, checked her badge swipe records, and looked at video.  The evidence

showed that she had not been doing floor checks and had never gone to the second and third

floors.  Mr. Burke verified this by checking her badge swipes.  Ms. Miller had represented in

writing that she had performed her floor checks when, in fact, she had not done so. She falsified records. Mr. Burke did not know whether plaintiff falsified records. But Mr. Burke believed plaintiff's situation and Ms. Miller's situation were similar.

Defendants assert that Charmaine Jones is another employee who is similarly situated to plaintiff. Mr. Burke contacted Mr. Harper more than once about CMKA's employee Charmaine Jones because she failed to come to work at a designated shift. After Mr. Burke first contacted CMKA about Ms. Jones missing a shift, CMKA counseled her and she returned. CMKA, however, was contacted several more times about Ms. Jones missing shifts. CMKA did not continue placing Ms. Jones at AWG.

**B.    Legal Standard**

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving

party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

C.    **Analysis**

Plaintiff argues he is entitled to partial summary judgment on the question whether he is disabled for purposes of the ADA. Conversely, CMKA contends that plaintiff is not disabled and it is entitled to summary judgment against plaintiff's ADA discrimination and retaliation claims in their entirety. AWG contends it, too is entitled to summary judgment against plaintiff's ADA discrimination and retaliation claims. AWG also argues it is entitled to summary judgment because no reasonable jury could find that it was plaintiff's employer.

The Tenth Circuit analyzes ADA discrimination and retaliation claims based on circumstantial evidence under the *McDonnell Douglas*[20] analytical framework. *See Dewitt v. Sw.*

---

[20]    *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017) (applying *McDonnell Douglas* framework to

ADA discrimination claim); *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir.

2016) (applying *McDonnell Douglas* framework to ADA retaliation claim).  Under the

*McDonnell Douglas* burden-shifting framework, the court must apply a three-step analysis:

> (1) First, the plaintiff must establish a prima facie case of discrimination or retaliation,
>
> (2) If the plaintiff satisfies this initial burden, the defendant employer must offer a legitimate non-discriminatory reason for the adverse employment action; and
>
> (3) The burden then shifts back to the plaintiff who must show there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual.

*Dewitt*, 845 F.3d at 1307 (internal quotation marks and citations omitted).

To establish a prima facie case of discrimination under the ADA, plaintiff must show:

"(1) he is disabled as defined under the ADA; (2) he is qualified, with or without reasonable

accommodation by the employer, to perform the essential functions of the job; and (3) he was

discriminated against because of his disability."  *Adair*, 823 F.3d at 1304 (citing *Hawkins v.

Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015)).

To establish a prima facie case of retaliation under the ADA, plaintiff must show:  "(1) he

engaged in a protected activity; (2) he was subjected to an adverse employment action

subsequent to or contemporaneous with the protected activity; and (3) there was a causal

connection between the protected activity and the adverse employment action."  *Foster v.

Mountain Coal Co., LLC*, 830 F.3d 1178, 1187 (10th Cir. 2016) (internal quotation marks,

correction, and citation omitted).

CMKA argues that it deserves summary judgment because, as a matter of law, plaintiff

cannot establish a prima facie case of either a discrimination or retaliation claim.  And even if

plaintiff could do so, CMKA argues, he has not adduced admissible evidence from which a reasonable jury could find pretext. In short, CMKA says, no triable issue exists about pretext. AWG joins these arguments.

But as a threshold issue, AWG argues it was not plaintiff's employer and so, as a matter of law, it could not violate plaintiff's rights under the ADA. The court begins with this question because if AWG wasn't plaintiff's employer, he cannot prevail on either of his claims against AWG.

### 1.     AWG was not Plaintiff's Employer

At the very least, AWG's argument begins with a correct premise. To make a prima facie case of discrimination or retaliation under the ADA, plaintiff first must prove that AWG was his employer. *See Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1225 (10th Cir. 2014) (requiring plaintiff, to make a prima facie case of wage discrimination and retaliation under Title VII, to prove defendant was her employer); *see also Bennett v. Henderson*, 15 F. Supp. 2d 1097, 1112 (D. Kan. 1998), *aff'd*, 172 F.3d 62 (10th Cir. 1999) ("The elements of the *prima facie* case of retaliation are the same whether a plaintiff proceeds under the . . . ADA . . . or Title VII.").

Depending on "the situation" at hand, the Circuit instructs the court to "choose[] among three different tests to determine whether a defendant is an employer." *Knitter*, 758 F.3d at 1225–26. They are:  (1) the hybrid test; (2) the joint-employer test; and (3) the single-employer test. *Id.* at 1226. Here, the court applies the joint-employer test because plaintiff claims both AWG and CMKA were his employers. *See* Doc. 173 (Pretrial Order) at 3 (plaintiff's contentions, asserting that "in 2014, he was an employee of both Defendant AWG and Defendant CMKA.").

Under the joint-employer test,

> [T]wo entities are considered joint employers if they share or co-determine those matters governing the essential terms and conditions of employment. Both entities are employers if they both exercise significant control over the same employees. An independent entity with sufficient control over the terms and conditions of employment of a worker formally employed by another is a joint employer . . . .

*Knitter*, 758 F.3d at 1226 (internal quotation marks and citations omitted). The right to terminate an employment relationship is the most important factor demonstrating control over the terms and conditions of the employment. *Id.* (citing *Bristol v. Bd. of Cty. Comm'rs*, 312 F.3d 1213, 1221 (10th Cir. 2002) (en banc)). Courts also consider other factors, including: "[T]he ability to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; day-to-day supervision of employees, including employee discipline; and control of employee records, including payroll, insurance, taxes and the like." *Id.* (internal quotation marks, corrections, and citation omitted).

AWG argues that plaintiff has failed to assemble sufficient admissible evidence permitting a reasonable jury to find that AWG was his joint employer. Plaintiff has adduced admissible evidence to support some of the factors. But the summary judgment record need not be devoid of admissible evidence supporting plaintiff's position under these factors. Instead, "taking all the factors together," the court must determine whether AWG's control over plaintiff was sufficient for a reasonable jury to find that AWG was his joint employer. *See id.* (affirming summary judgment against plaintiff because defendant lacked authority to terminate plaintiff and, taking all the factors together, defendant's authority to supervise and enforce rules were not a sufficient basis for a reasonable jury to find that defendant was plaintiff's joint employer). The next five subsections analyze this proposition using the factors applied by the joint-employer test.

### a.       Power to Hire or Terminate

When determining whether a company is a joint employer, the most important factor is the right to terminate employment.  *Id.*  Under this factor, the Tenth Circuit has considered both "whether the alleged joint employer had [an] impact on the hiring decision and had the ability to terminate" the employment relationship.  *Banks v. St. Francis Health Ctr., Inc.*, No. 15-CV-2602-JAR, 2016 WL 6905581, at *13 (D. Kan. Nov. 21, 2016) (citing *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1324 (10th Cir. 2004)).

The summary judgment record here includes no evidence capable of supporting a reasonable finding that AWG had the power to hire or fire plaintiff.  The Agreement between AWG and CMKA provided that CMKA was responsible to hire all Asset Protection Agents unless AWG otherwise agreed.

Plaintiff responds to this undisputed fact by asserting that AWG has failed to establish that it did not otherwise agree.  Doc. 199 at 63.  But this argument misapprehends how summary judgment works.  Because the employment relationship is an element of his prima facie case, plaintiff bears the burden to prove that AWG was his employer—or, as he theorizes here, one of his two joint employers.  *Knitter*, 758 at 1225.  With its summary judgment motion, AWG placed this element in dispute.  That is all it must do.  As the Circuit has explained, AWG "need not negate [plaintiff's] claim, but need only to point to an absence of evidence to support [plaintiff's] claim" that AWG was his joint employer.  *Kannady*, 590 F.3d at 1169.

While it was not incumbent on AWG to adduce evidence negating this element of plaintiff's claim, AWG nonetheless did so.  The summary judgment facts establish that plaintiff never submitted an employment application to AWG.  He never interviewed with AWG.  Instead, plaintiff applied to CMKA after noticing a Craigslist post made by CMKA.  He then

interviewed with two of CMKA's supervisory employees. And when CMKA hired plaintiff, they sent him two letters. The letters confirmed CMKA's offer of employment and described the terms and conditions of his employment with CMKA—specifically, that he was an at-will employee of CMKA. These uncontroverted facts support a conclusion that CMKA, but not AWG, had the power to hire and fire plaintiff. *See Banks*, 2016 WL 6905581 at *14–15 (finding that the entity who "posted the job requisition, conducted the interview, and hired Plaintiff through [an] offer letter" that "maintained the right to terminate the employment" had the power to fire plaintiff).

Trying to meet his burden to adduce admissible evidence permitting a reasonable jury to find that AWG was his joint employer, plaintiff argues that he was hired to fill a position based on a site owned and operated by AWG. The summary judgment record surely supports this fact. But what plaintiff's argument lacks is legal authority suggesting that this fact makes AWG his employer. Plaintiff has cited no such authority, and the court is aware of none.

Indeed, the precedent from our court—and, more broadly, our Circuit—directly contradicts plaintiff's theory. For example, Chief Judge Robinson granted summary judgment against plaintiff's joint-employer theory in *Banks*. And the summary judgment facts there about the power to hire were substantially similar to the ones here. *See id.* *6–7. For example, the *Banks* plaintiff argued that a Topeka, Kansas, hospital was plaintiff's joint employer even though a separate company had hired her to provide services under a contract between Conifer—the hiring company—and the defendant hospital. Specifically, Conifer had posted the job requisition for a position at the hospital. Plaintiff applied for the position through Conifer, not defendant. And plaintiff interviewed with Conifer, not defendant. Also, Conifer sent plaintiff a letter offering employment with Conifer as an at-will employee. The letter included plaintiff's

compensation arrangement.  *Banks* held, on summary judgment, that the hospital was not plaintiff's joint employer.

Plaintiff also argues that a reasonable jury could infer that AWG possessed authority to hire plaintiff—or hire him jointly—because CMKA's Mr. Smith sent an email to AWG's Mr. Burke two months after CMKA had hired plaintiff.  In this email, CMKA kept AWG informed about the status of CMKA's hiring efforts.  Specifically, Mr. Smith advised that CMKA was going to send a candidate—not plaintiff—over to the AWG facility after he completed his background check and initial drug screening.  Plaintiff contends that some of the words in that email provide a basis for a jury to find that AWG had participated in the decision to hire plaintiff.  Namely, plaintiff says, CMKA's email mentions that Mr. Smith from CMKA had attended candidate interviews himself so he would have a better understanding "of who to select . . . or at least [who] to offer to [AWG] as a candidate."  Doc. 180-27 at 2 (ellipse in original).  Plaintiff argues that the second half of this phrase suggests that AWG had "almost unlimited control" over the hiring of employees.  Doc. 199 at 63–64.

Plaintiff also asks the court to draw two significant inferences from these facts.  First, he asks the court to infer that the statement in CMKA's email establishes that AWG had the power to hire Asset Protection Agents in May 2014.  And second, he argues that the email shows— although the email does not reference plaintiff's hiring process—that AWG had possessed the power to hire plaintiff some two months earlier.  But no reasonable jury could conclude that CMKA's email supports the inferences plaintiff tries to project onto it.  AWG was the company purchasing services from CMKA.  Allowing AWG to offer input about which one of CMKA's employees CMKA might use to fulfill its contractual obligation to AWG does not transform AWG into that person's employer.  In short, plaintiff tries to stack one irrational inference on top

of another to create a properly triable issue.  This tactic will not suffice.  *See Gregg v. Ohio Dep't of Youth Servs.*, 661 F. Supp. 2d 842, 859 (S.D. Ohio 2009) ("While courts are required to draw every reasonable inference in favor of the party opposing summary judgment, they are not permitted to stack inference upon inference to preserve an issue for the jury." (citing *Taylor v. Mich. Dept. Of Corr.*, 69 F.3d 76, 86 n. 2 (6th Cir. 1995) (Wellford, J., dissenting))).

From Mr. Smith's email to AWG, a jury properly could infer that AWG was invited to provide input about which one of CMKA's employees it preferred.  For instance, later in the email, Mr. Smith told AWG of his plan to send the candidate to AWG "for a look by" Mr. Burke and AWG's Kansas City Security Supervisor.  Doc. 180-27 at 2.  But neither this email nor any other admissible evidence establishes that AWG's recommendation determined whether CMKA would hire the candidate.  Also, Mr. Smith indicated that the candidate would not go to AWG until after he had completed his background check and initial drug screening—activities generally reserved for later in the hiring process.  And most importantly, nothing in the summary judgment record shows that AWG ever made a recommendation about this candidate or any other—including plaintiff.

While this factor considers a company's ability to provide input about a hiring decision, no court has defined the level of input that amounts to the requisite power to hire.  And plaintiff has cited no authority suggesting a client's ability to make recommendations to a vendor equates to the power to hire.  Indeed, in other contexts, authority suggests just the opposite.

In Fair Labor Standards Act cases, when courts decide whether a company was an employer, they also consider the power to hire and fire employees.  *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 308 (S.D.N.Y. 2011) ("In *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984), the court noted that the 'economic reality' test 'include[d]

inquiries' into four factors:  'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'  735 F.2d at 12.").

In *Copantitla*, the court held that one of the defendants was not the plaintiffs' employer. *Id.* at 310.  Reaching this conclusion, the court explained that this defendant only had the power to make recommendations about hiring and firing.  Specifically, this defendant's recommendations could be disregarded.  Also, the court noted that plaintiffs provided no evidence indicating that this defendant had played "any other role with respect to hiring and firing, or that her recommendations played a material role in any employee being hired."  *Id.* Although *Copantitla* uses a different test overall to determine whether an employment relationship existed, the factors are substantially similar.  So, the analysis of the power to hire and fire factor in *Copantitla* is instructive.

Here, plaintiff suffers from the same problems as the *Copantitla* plaintiffs.  He has failed to adduce any evidence that CMKA had to heed AWG's recommendations.  Also, plaintiff shows no facts in the summary judgment record that AWG did more than make a recommendation, or that its recommendations played a material role in plaintiff's hiring.  In sum, even when viewed in the light most favorable to plaintiff, this lone email provides no basis for finding that AWG had the power to hire plaintiff.

Next, the court considers the second part of this factor—the power to terminate plaintiff's employment.  As noted, the governing cases recognize this power as the "most important" factor in the joint-employer test.  *Knitter*, 758 F.3d at 1227 (citing *Bristol*, 312 F.3d at 1221).  Here, the

summary judgment facts establish that AWG lacked the capacity to terminate plaintiff's employment.

Under the Agreement between CMKA and AWG, AWG could reject any Asset Protection Agent assigned by CMKA to the AWG facility.  But the right to reject an employee designated by a contractor does not equal the right to terminate the employee's employment with another company.  *See* Doc. 48 at 5 ("AWG's ability to ask that [CMKA] no longer assign plaintiff to AWG does not mean that AWG had the right to terminate plaintiff." (first citing *Knitter*, 758 F.3d at 1229; then citing *Banks v. St. Francis Health Ctr., Inc.*, No. 15-CV-2602-JAR, 2016 WL 1298056, *3 (D. Kan. Mar. 31, 2016) (deciding a Motion to Dismiss)).  Both *Knitter* and *Banks* support the conclusion that plaintiff must adduce evidence that AWG possessed a right greater than the right to reject an employee for assignment to its premises.  *See Knitter*, 758 F.3d at 1229 (finding no genuine dispute whether defendant lacked the power to fire and defendant could, at most, request that plaintiff's employer reassign her to a different location); *Banks*, 2016 WL 6905581 at *13 (holding on summary judgment that defendant had no power to terminate based on an ability to request reassignment); *see also Zinn v. McKune*, 143 F.3d 1353, 1358 (10th Cir. 1998) (affirming summary judgment by finding plaintiff was not the defendant's employee, in part, because "[alt]hough the [defendant] retains the right to request removal of [the contractor's] personnel with whom it is dissatisfied, and did so in this case, [the contractor] alone exercises control over the hiring and firing of [the contractor's] personnel."); *Palage v. HCA-HealthONE, LLC*, No. 11-CV-01285-LTB-CBS, 2012 WL 5493998, at * 6 (D. Colo. Nov. 13, 2012) (granting summary judgment for defendant because "[a]lthough [defendant] did have the contractual ability to request the re-assignment of [the

contractor's] employee assigned to its facilities, this does not equate to either hiring or firing [the contractor's] employees.").

Trying to establish a genuine dispute about whether AWG held power greater than simply the capacity to request plaintiff's reassignment, plaintiff relies on mischaracterization and conjecture. First, plaintiff notes that AWG told CMKA that it did not want CMKA to terminate plaintiff because of his disability. And plaintiff contends that this statement—combined with the fact that he was not fired—supports a reasonable inference that AWG controlled plaintiff's termination. The court declines to adopt plaintiff's curious reasoning. To equate a statement encouraging a contract partner to comply with the federal employment law as evidence of control is simply too great a reach to count as a reasonable inference.

Plaintiff also argues that when CMKA's Mr. Harper told AWG's Mr. Burke that he was going to bring plaintiff in for his termination, he was acting on AWG's behalf by firing plaintiff. Importantly, even plaintiff's view of the summary judgment record shows that plaintiff was not fired from CMKA then. He simply was removed from AWG. This email demonstrates that Mr. Harper was removing plaintiff from his assignment at AWG as AWG had requested and does not mean that AWG possessed the right to terminate his employment.

Finally, plaintiff contends that Mr. Harper's May 29, 2014 email to plaintiff, explaining that AWG controlled the EMT training and CMKA had to abide by AWG's wishes, demonstrates that CMKA "would do whatever Defendant AWG wanted with regard to Plaintiff's employment." Doc. 199 at 64. To draw this inference based on the fact that AWG controlled aspects of plaintiff's training—as plaintiff urges—is simply too great a leap. *See Banks*, 2016 WL 6905581 at *15 (granting summary judgment to defendant against joint-employer theory even though defendant had provided plaintiff training about its electronic record keeping systems

and human resources policies, and conducted a general orientation on defendant's policies and procedures).

Plaintiff fails to demonstrate a genuine issue of material fact about AWG's power to hire him or terminate his employment—the most important factor determining joint-employment.

### b.      Rules, Assignments, and Training

Next, AWG argues that it did not promulgate work rules, issue work assignments, or provide training beyond those expected of a contractual vendor-client relationship.  Under the Agreement, CMKA was responsible for providing uniforms, training, and supervision of the Asset Protection Agents.  And their conduct was governed by policy, rules, and post orders that CMKA and AWG agreed on.

Here, although plaintiff has adduced some evidence showing AWG promulgated plaintiff's on-site rules, the summary judgment record does not establish a level of control sufficient for a reasonable jury to conclude AWG was plaintiff's joint employer.  When CMKA hired plaintiff, plaintiff received a CMKA Employee Handbook, reviewed it, and signed a form acknowledging that he understood the policies in it.  Plaintiff received no such handbook from AWG.  While assigned to the AWG site, the post orders governed plaintiff's conduct.  These post orders were maintained in a reference manual for the Desk Officers to use.  CMKA had a right under the Agreement to consult on the post orders, but generally AWG created them. CMKA could review the post orders and notify AWG of any concerns but, to Mr. Harper's recollection, CMKA never had requested any changes to them.  But Mr. Harper always believed AWG had the final approval authority on post orders.  So CMKA could provide input, but AWG had more control of the on-site rules.

Plaintiff's overall conduct was governed by the CMKA Employee Handbook. This handbook, among other things, addressed time off and several "on the job" topics such as conduct, appearance, and scheduling. So, although AWG largely controlled the post orders, CMKA had input and CMKA controlled the policies governing plaintiff's conduct. Accordingly, there is no basis for a reasonable jury to infer that AWG's control over plaintiff's rules exceeded those typical of a vendor-client relationship. *See Banks*, 2016 WL 6905581 at *15–16 (concluding that the work rules did not exceed the vendor-client relationship when defendant-client required plaintiff to comply with its rules, but vendor promulgated plaintiff's work rules and vendor's policies governed plaintiff).

The facts in the summary judgment record establish that CMKA also determined plaintiff's assignments. CMKA assigned plaintiff to work at AWG and could reassign him as it pleased. Plaintiff knew that CMKA possessed this control. He asked CMKA—not AWG—to reassign him because he was not receiving EMT hours while stationed at AWG's premises.

Plaintiff argues that AWG had significant control of his assignments. He bases this on three incidents. First, CMKA's Mr. Harper adjusted plaintiff's schedule when he mistakenly scheduled plaintiff for a double shift and AWG brought it to Mr. Harper's attention. Second, Mr. Harper cautioned the Asset Protection Agents against overtime after a discussion with AWG. And third, Mr. Harper explained to plaintiff that his EMT training had to be deferred because of AWG's wishes.

None of these, separately or together, establishes a basis for a reasonable jury to conclude that AWG controlled plaintiff's work assignments. CMKA assigned plaintiff his work hours. Plaintiff has noted three isolated incidents and says they amount to control. Under the Agreement, AWG had to pay CMKA time and a half for overtime worked by CMKA's

employees designated to work at AWG's site. So AWG's steps to minimize its overtime obligations does not demonstrate control of work assignments. Finally, AWG heavily relied on two of its own employees for EMT duties. So, Mr. Harper noting that CMKA had to comply with AWG's wishes about postponing plaintiff's EMT training does not show control.

In *Banks*, defendant's employee provided plaintiff a list of patients to see each day and required her to conduct extra duties. 2016 WL 6905581 at *16. The court found this relationship did not exceed the vendor-client relationship because the patient assignment was designed to satisfy the vendor-client agreement. And the vendor approved the extra duties. *Id.*

Here, Mr. Burke's occasional reminders about overtime to Mr. Harper and Mr. Burke's oversight of CMKA's scheduling is far less prevalent than the work assignment in *Banks*. The court thus concludes that plaintiff failed to establish a genuine dispute about whether AWG controlled plaintiff's work assignment.

Finally, AWG argues that it only provided limited training on desk officer and EMT duties. Plaintiff responds that, in fact, AWG had substantial control of this training. Plaintiff relies on Mr. Harper's statements that: (1) AWG would tell CMKA when plaintiff's desk officer training was complete and (2) he did not know if plaintiff completed his EMT training because sometimes they notified CMKA and sometimes they didn't.

The training inquiry considered by this factor focuses on the amount of training. *See Banks*, 2016 WL 6905581 at *15 (determining defendant provided training "beyond that typically provided within a vendor-client relationship"). In *Banks*, the defendant provided training beyond orientation and training about the hospital systems because it also provided training about patient accounts, diversity, and other regularly scheduled training. *Id.* Here, there are no facts in the summary judgment record to establish AWG provided training beyond general

orientation and AWG's systems. Instead, for Desk Officer duties, AWG trained plaintiff about the process for conducting background checks and the areas to monitor using the video monitors. And for EMT duties, AWG would have trained plaintiff about AWG protocols, location of equipment, and similar topics. No reasonable jury could find that these topics exceed the scope of orientation and systems training.

So, the summary judgment record, even when viewed in plaintiff's favor, does not show that AWG promulgated work rules, issued work assignments, or provided training beyond those expected of a normal contractual vendor-client relationship.

### c.     Supervision and Discipline

Next, AWG argues that it did not exercise sufficient supervision and discipline to establish a joint-employer relationship. "Some degree of supervision and even discipline is to be expected when a vendor's employee comes on another business's work site." *Id.* at 17 (citing *Knitter*, 758 F.3d at 1230). "Supervision that is limited and focuses on workplace safety issues typically will not be considered the type of supervision indicating joint employers." *Id.* (citing *Knitter*, 758 F.3d at 1230). "Courts should consider whether supervision extended to such matters as training or formal performance evaluations provided to employees." *Id.* (citing *Knitter*, 758 F.3d at 1230) (other citation omitted).

In *Knitter*, the defendant's supervision was limited to dress code and safety harness requirements. 758 F.3d at 1230. Defendant supervised plaintiff's daily work by providing instruction about how to perform certain tasks, and notified plaintiff if her work did not meet defendant's standards. *Id.* But it did not include training or formal performance. *Id.* Ultimately, the Tenth Circuit determined the level of supervision was consistent with a client-vendor relationship and did not make defendant a joint employer. *Id.*

In *Banks*, our court found that one of defendant's employee's supervisory role went beyond what *Knitter* discussed. *Banks*, 2016 WL 6905581 at *18. This employee was on-site and told plaintiff she was her supervisor. She assigned plaintiff daily tasks and provided some training. So the court found that her role exceeded simple direction on limited tasks. Even though this single employee's role exceeded simple direction, the court determined that defendant's supervisory power insufficient to create an employment relationship. Although the vendor did not have a supervisor on-site, plaintiff was in close contact with the vendor's supervisory employees. And importantly, the vendor conducted performance evaluations, not the defendant. *Id.*

Here, AWG had an employee that exercised some supervisory control over plaintiff—Ms. Morlan. The summary judgment record establishes that Ms. Morlan trained plaintiff about Desk Officer duties—which the summary judgment record establishes was within the scope of a client-vendor relationship—and she determined when plaintiff was ready to take his own shift. Beyond that, she sent an email to Mr. Burke and Mr. Hulett about a conversation she had with plaintiff after she found doors unlocked. During the conversation, she asked plaintiff when he checked the doors. Plaintiff contends that Ms. Morlan's conversation with plaintiff and her following email to AWG employees suggests AWG had supervisory control of plaintiff. No reasonable jury could conclude that this level of supervision was a sufficient basis for AWG to be plaintiff's joint employer. The court rejects plaintiff's argument.

Ms. Morlan had minimal supervision of plaintiff during his training which culminated when he was ready to take his own shift. And Ms. Morlan's email does not suggest that she was supervising plaintiff's duties. Instead, she relieved plaintiff and found doors unlocked so she asked when he did his rounds—a reasonable peer-to-peer question. Then, she reported to *her*

supervisors who, in turn, reported it to plaintiff's supervisors at CMKA. Ms. Morlan's supervision never rose to the level described in *Banks*. Indeed, plaintiff understood that Mr. Harper was his supervisor who monitored his performance. And plaintiff generally communicated with CMKA supervisory employees when he had questions or issues arose.

Plaintiff next argues that AWG's monitoring of internet usage and the badge swipe check suggests AWG supervised plaintiff's performance to the minute detail. This overstates AWG's supervision.

The facts show that Mr. Burke was notified when anyone sitting at the front desk visited a pornographic site—Asset Protection Agent, AWG employee, or anyone else. A monitoring system is common practice to ensure computers are not misused. And no reasonable jury could find that AWG's use of one suggests supervision sufficient to establish control. Also, there are no facts in the record that any AWG employee checked the badge swipe records other than when Mr. Burke was alerted that plaintiff had not completed his rounds. Plaintiff thus has not established a genuine dispute about whether AWG supervised him.

Consistent with the level of supervision, CMKA primarily disciplined plaintiff. When concerns with plaintiff's performance arose, CMKA addressed them with plaintiff. Specifically, AWG had concerns about plaintiff's appearance, computer usage, and his door checks. AWG contacted CMKA about those concerns and CMKA then addressed them with plaintiff. Plaintiff argues that CMKA simply was an intermediary for AWG's wishes—like a senior to middle manager relationship. And AWG was instructing CMKA how to discipline a subordinate. But this is not a reasonable inference.

AWG had supervisors on site that could observe plaintiff's appearance, while CMKA did not. And AWG had access to the computer system and the badge swipe records, not CMKA. So

AWG communicated its observations to CMKA for CMKA action.  There are no facts in the record suggesting AWG ever followed up with CMKA to determine if CMKA followed its wishes—something a senior manager would do to a middle manager.  Thus, plaintiff provides no factual support for this argument.

Plaintiff does note that AWG was "getting on" him about leaving the desk for extended periods of time to check doors and turn off lights.  No reasonable jury could conclude that this minimal disciplinary role goes beyond a client-vendor relationship.  *See Banks*, 2016 WL 6905581 at *18 (finding that a write up submitted to Human Resources did not exceed the vendor-client relationship).

### d.     Compensation, Benefits, and Hours

The uncontroverted facts also establish that CMKA, not AWG, controlled plaintiff's pay and benefits.  CMKA set his pay rate and provided insurance, reimbursement of licensing fees, and an employee stock ownership plan.  Plaintiff contends that AWG indirectly paid plaintiff and CMKA just took its cut.  Our Circuit rejected this very argument in *Knitter*.  758 F.3d at 1229.

In *Knitter*, plaintiff was a "handyman" for a general contracting company.  *Id.*  That contracting company had one client during the time at issue—defendant property management company.  Plaintiff argued that defendant indirectly paid her because it set flat rates for handyman services that it paid the contract company.  *Id.*  The Circuit rejected this argument because defendant had no control over how much the contracting company deducted for itself and defendant never paid plaintiff directly.  Also, defendant never negotiated plaintiff's rates or vary her rates.  *Id.*

Similarly, AWG set a rate with CMKA for the Asset Protection Agents here.  And there are no facts in the summary judgment record to establish that AWG decided how much CMKA

paid the Asset Protection Agents. Also, there are no facts showing that AWG negotiated plaintiff's hourly rate or that his hourly rate varied from other Asset Protection Agents.

The court already has determined that the summary judgment facts do not establish that AWG had sufficient control of plaintiff's hours to create a joint-employer relationship. *See supra*, Part II.C.1.b. And so, the court concludes that plaintiff has failed to show a genuine dispute about whether AWG controlled his compensation, benefits, and hours.

### e.    Employee Records

Next, AWG contends that there is no joint-employer relationship because it did not maintain employee records for plaintiff. Employee records include "payroll, insurance, taxes, and the like." *Knitter*, 758 F.3d at 1226. The uncontroverted facts establish that the Agreement required CMKA to pay all required taxes. Indeed, plaintiff's tax forms came from CMKA. And plaintiff submitted federal I-9 paperwork to CMKA. Plaintiff also signed direct deposit paperwork with CMKA.

Plaintiff notes that AWG made him complete daily activity reports and daily shift summaries. Because these documents include the times that the shift began and ended, plaintiff argues that they can be a type of time card. Although they might have enabled AWG to prepare a time card, no fact in the record suggests that anyone used them for that purpose. Plaintiff also notes that AWG tracked his badge swipes. But he fails to argue how badge swipes amount to payroll, insurance, or taxes.

The court thus concludes that plaintiff has failed to establish any facts from which a reasonable jury could find that AWG maintained employee records for plaintiff.

### f.    Conclusion

In sum, "taking the factors together," the court concludes that no reasonable jury could find that AWG was plaintiff's employer. *Knitter*, 758 F.3d at 1231. Plaintiff failed to show a genuine dispute whether AWG could hire him or terminate his employment—the most important factor. Similarly, there is no genuine dispute whether AWG controlled plaintiff's compensation, benefits, hours, or employee records. While plaintiff has adduced some admissible evidence that AWG promulgated rules and supervised plaintiff, they are not sufficient under the governing case law. AWG's level of control over these items is not sufficient for a reasonable jury to conclude under all the factors that AWG was plaintiff's joint employer. *See id.* (affirming summary judgment against plaintiff because defendant's authority to supervise and enforce rules were not a sufficient basis for a reasonable jury to find that defendant was plaintiff's joint employer). For these reasons, AWG is entitled to summary judgment against both of plaintiff's claims.

### 2.    Plaintiff is a Disabled Person under the ADA

CMKA does not dispute that plaintiff was its employee. But it argues that plaintiff cannot establish a prima facie case of ADA discrimination or retaliation. For a discrimination claim, plaintiff must first show that he is a disabled person under the ADA. *Adair*, 823 F.3d at 1304. Plaintiff asks for partial summary judgment in his favor on this first element.

In 2008, Congress passed the ADA "with the stated goal of ensuring that [t]he definition of disability . . . be construed in favor of broad coverage." *Roecker v. Brennan*, No. 15-7201-DDC-JPO, 2017 WL 445504, at *7 (D. Kan. Feb. 2, 2017) (quoting *Adair*, 823 F.3d at 1305). To achieve this goal, Congress amended the definition of "disability." *Id.* (citing *Adair*, 823 F.3d at 1305). Now, "[t]he term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such

76

individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ."  42 U.S.C. § 12102(1).

To establish an ADA disability under subsection (A), "a plaintiff must articulate with precision both [his] impairment and the major life activity it substantially limited."  *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1218 (10th Cir. 2010) (internal quotation marks and citation omitted).  An impairment can be "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as neurological, musculoskeletal, [or] special sense organs . . . ."  29 C.F.R. § 1630.2(h)(1).

Here, CMKA does not dispute that plaintiff has a seizure disorder.  Nor does it dispute that his disorder is an impairment.  So the issue of disability turns on whether plaintiff's seizure disorder is substantially limiting.  Because plaintiff's seizure disorder is an episodic condition, the court must determine whether it is substantially limiting while plaintiff is having a seizure.  *See* 42 U.S.C. § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.").  The court makes this determination by analyzing the plaintiff's impairment at the time of the employment decision.  *See Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000) ("The determination as to whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision." (citation omitted)), *overruled on other grounds by Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001).

"An impairment is substantially limiting when it renders an individual either unable or significantly restricted in [his] ability to perform a major life activity compared to the average person in the general population."  *Id.* (internal quotation marks and citation omitted).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing,

hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).

Here, plaintiff contends that his seizure disorder substantially limits his ability to perform manual tasks, concentrate, and communicate.  Indeed, the uncontroverted facts show that plaintiff experiences both tonic-clonic and complex partial seizures.  During a tonic-clonic seizure, he loses consciousness.  And while plaintiff is experiencing a complex partial seizure, he has "difficult doing anything purposefully."  Doc. 176-1 at 10 (Seeley Dep. 135:1–4). Specifically, during these seizures, plaintiff is unable to perform manual tasks, his ability to concentrate is limited, and his ability communicate is limited substantially.

CMKA argues that Dr. Seeley and Dr. Kaplan's opinions about plaintiff's ability to perform manual tasks, concentrate, and communicate are conclusory statements, and "[n]one of the evidence specifies the actual major life activities that Plaintiff is unable to perform."  Doc. 194 at 16.  This is simply wrong.  At a minimum, the facts in the summary judgment record establish that during a seizure plaintiff is limited in his ability to concentrate and communicate— two major life activities identified by § 12102(2)(A).  The facts also establish that plaintiff is unable to perform manual tasks—a major life activity—during a seizure.  The court agrees with CMKA's argument that Dr. Seeley and Dr. Kaplan's opinions on this major life activity are conclusory.  And plaintiff shows no facts in the record establishing which manual tasks he is unable to perform.  But even assuming plaintiff has failed to show that he is unable to perform manual tasks, it is uncontroverted that his ability to concentrate and communicate is limited during a seizure.

CMKA also argues that the frequency and duration of plaintiff's seizures suggest that they do not substantially limit his major life activities.  The frequency, however, does not affect

the court's analysis because the court only analyzes how much the impairment limits plaintiff while it is active. *See* 42 U.S.C. § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."). While the summary judgment record shows that most of plaintiff's seizures are small, and last less than "a couple minutes," the quality of plaintiff's mental activity is impaired during that period. And sometimes he has tonic-clonic seizures that cause him to lose consciousness totally. During these periods, whether plaintiff's seizure is a small one or he loses consciousness, the uncontroverted facts establish that plaintiff's ability to concentrate or communicate are substantially limited. And so, the court finds that CMKA has failed to establish a genuine issue of material fact whether plaintiff's seizure disorder is a disability under the ADA.

For this reason, the court grants partial summary judgment in plaintiff's favor on the question whether he is a disabled person under the ADA.

### 3.    A Genuine Dispute Exists Whether Plaintiff was a Qualified Individual

To establish a prima facie case of discrimination, plaintiff also must show that "he is qualified, with or without reasonable accommodation by the employer, to perform the essential functions of the job," and also, that "he was discriminated against because of his disability." *Adair*, 823 F.3d at 1304. CMKA argues that it is entitled to summary judgment on plaintiff's discrimination case because plaintiff could not perform the essential functions of his jobs with AWG, so he was not a qualified individual.

To determine whether plaintiff is a qualified individual, the court engages in a two-part analysis. *Adair*, 823 F.3d at 1307 (citing *Hawkins*, 778 F.3d at 887). First, the court inquires "whether the plaintiff can perform the essential functions of the job, *i.e.*, functions that bear more than a marginal relationship to the job at issue." *Id.* (citing *Hawkins*, 778 F.3d at 887). If

plaintiff is unable to perform the essential functions of the job, the court then must determine "whether any reasonable accommodation by the employer would enable him to perform those functions." *Id.* at 887–88 (citing *Hawkins*, 778 F.3d at 887).

The court begins by addressing the essential functions of the Desk Officer and EMT/Patrol Officer positions. Under the ADA, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Essential functions are "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1). A function may be essential because "the reason the position exists is to perform that function," or because of "the limited number of employees available among whom the performance of that job function can be distributed . . . ." *Id.* § 1630.2(n)(2). Our Circuit has recognized that courts must give "deference to an employer's judgment concerning essential functions." *Hawkins*, 778 F.3d at 884–85 (first citing *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir. 2001) (noting that the essential function "inquiry is not intended to second guess the employer"); then citing *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003) (explaining that some deference is due because "[d]etermining whether a particular function is essential is a factual inquiry")).

Here, CMKA posted the job vacancy on Craigslist. The summary judgment facts show that this is the only job description plaintiff ever saw for the position. The description described the experience and skills required by the job. The advertised position required a certified and licensed EMT who was reliable, punctual, trustworthy, and customer-service oriented. And the position required good oral and written communication skills, basic computer operation skills,

professional representation of the company, good physical condition, and a neat and clean appearance. Plaintiff argues that the court should rely on this job description to determine the essential functions of plaintiff's job.

CMKA disagrees in part, contending that driving, patrolling on foot, working alone, and providing EMT services also were essential functions of the EMT/Patrol Officer position. And CMKA contends that working alone and patrolling on foot were essential functions of the Desk Officer position. CMKA bases its argument on AWG's policy allowing individual departments and their hiring managers to identify the essential functions of a position. AWG did not require each department to list the essential functions of each job. Instead, Mr. Burke—AWG's Senior Manager for Corporate Security—identified the essential functions of the EMT/Patrol Officer and Desk Officer positions during his deposition.

Mr. Burke identified the essential functions of the AWG EMT/Patrol Officer position as conducting patrols (by vehicle and on foot) of the entire AWG facility and handling medical calls at any of the facilities. The area for patrol included AWG's parking lots, the "DSG building," and AWG's on-site warehouse. Mr. Burke also identified other essential functions as: performing drug screens; handling post-accident drug and alcohol screens; assisting the Desk Officer with giving breaks (requiring cross-training on Desk Officer duties); checking fire extinguishers in the corporate building; assisting with conducting preemployment backgrounds; monitoring security cameras; accessing control; checking emergency lights and doors; responding to alarms; and performing floor and door checks.

No facts in the summary judgment record indicate that EMT/Patrol officers worked alone, much less, that working alone was an essential function of the position. So the court does not consider whether that is an essential function on summary judgment. Instead, the court must

consider whether driving, patrolling on foot, and providing EMT services are essential functions of the position plaintiff held.

CMKA's job posting does not include these functions, but the court nonetheless gives deference to AWG's judgment about the job's essential functions. Here, the court need not rely heavily on deference to AWG because the job title alone suggests that the position exists to perform the functions of patrolling and providing EMT services. *See* 29 C.F.R. § 1630.2(n)(2) ("A job function may be essential because the reason the position exists is to perform that function . . . ."). Plaintiff makes a conclusory statement that CMKA has failed to produce uncontroverted evidence showing that these are the essential functions of the EMT/Patrol Officer position. But he never argues, specifically, that patrolling and providing EMT services are not essential functions of this position.

CMKA argues that driving also was an essential function of the job. But the summary judgment record contains evidence suggesting that driving was a means of performing essential functions and not, in itself, an essential function. According to Mr. Burke, AWG requires its EMT/Patrol Officer to drive motor vehicles. The AWG warehouse facility is a million square feet occupying more than 40 acres of land. AWG requires EMT/Patrol Officers to patrol the entire facility. Also, EMT/Patrol Officers only can access another facility that they must patrol by driving on public roads. Finally, EMT/Patrol Officers may need to take other employees to a medical clinic. That task requires them to drive on public roads. Mr. Harper believed the only purpose for the EMT driving a motor vehicle is to respond to a medical call as quickly as possible.

Testimony suggests that both patrolling and providing EMT services are the true purposes for driving. The "fundamental job duties" of the EMT/Patrol Officer position are

patrolling and providing EMT services.  *See* 29 C.F.R. § 1630.2(n)(1).  But it is properly controverted whether driving is as well.  The summary judgment record suggests that driving is merely a means of accomplishing the essential functions.  So although AWG required its EMT/Patrol Officers to drive, it is controverted whether driving was an essential function.

The court concludes that no genuine issue of material fact exists whether patrolling and providing EMT services were essential functions of the EMT/Patrol Officer.  But a genuine issue remains whether driving was an essential function.  For this reason, the court cannot determine, as a matter of law, that plaintiff was not qualified to perform the essential functions of the EMT/Patrol Officer position.

Also, the court cannot determine, as a matter of law, that plaintiff was not qualified to perform the essential functions of the Desk Officer position.  CMKA contends that plaintiff could not perform two essential functions of the job—working alone and conducting foot patrols.  Plaintiff disputes that working alone is an essential function.  Indeed, AWG never identified working alone as an essential function.  AWG's Mr. Burke listed the following duties as essential functions:  sitting at the front desk of AWG's corporate office; answering phones; transferring calls to the proper divisions after hours; monitoring security cameras; accessing control; conducting preemployment background screens; and conducting floor and door checks.  But the summary judgment record also suggests that night shift Desk Officers were in the building alone with two IT employees—a fact that strengthens CMKA's argument.

But the court cannot weigh the competing evidence.  Instead, it must view the facts in the light most favorable to plaintiff—the party opposing summary judgment.  Although the Desk Officers on the night shift likely worked alone, the day shift did not.  So, it is controverted whether working alone was an essential function of the Desk Officer position.  It also is

controverted whether conducting foot patrols was an essential function. Mr. Burke identified conducting floor and door checks as an essential function. He described these checks as a patrol to ensure everything was in order and that all the doors were locked. But Desk Officers on the day shift during the work week did not have to conduct these checks. So while it seems more likely that foot patrols were an essential function, the current record does not allow the court to decide that question of fact as an undisputed one.

Even if patrolling, driving, and providing EMT services were essential functions of the EMT/Patrol Officer position, and working alone and conducting foot patrols were essential functions of the Desk Officer position, a reasonable jury could find that CMKA could have accommodated plaintiff reasonably and thus allowed him to perform the essential functions of the Desk Officer position. The ADA provides that a reasonable accommodation may include: "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). But, an employer is not obligated "to create a position out of wholecloth to accommodate the individual in question." *Hawkins*, 778 F.3d at 884 (citations omitted).

Here, accommodating plaintiff's disability would not have required CMKA "to create a position out of wholecloth." Instead, a reasonable jury could find that CMKA could have accommodated plaintiff reasonably by assigning him just to Desk Officer shifts.

The parties organize their arguments around two positions—the EMT/Patrol and Desk Officers. This is a reasonable approach because CMKA hired plaintiff as an Asset Protection Agent to fill those positions. But the job duties of an Asset Protection Agent differed depending

84

on the needs of the customer and the job site. An Asset Protection Agent assigned to AWG generally worked in the Guard Shack, worked at the front desk, performed EMT duties, and performed patrol duties.

Although those were the general duties of an Asset Protection Agent assigned to AWG, AWG originally entered into the Agreement with CMKA to provide security officers for the Guard Shack. But, plaintiff never worked in the Guard Shank. Indeed, AWG later outsourced those duties to another provider. And in March 2014, CMKA began providing Asset Protection Agents to cover some of the shifts for Desk Officer and, to a limited extent, EMT/Patrol Officers.

Initially, Asset Protection Agents covered the Desk Officer position for 88 hours each week. They covered the EMT/Patrol Officer position for 56 hours each week. Around June of 2014, AWG reduced the number of hours it needed from CMKA's Asset Protection Agents for the EMT/Patrol Officer job from 56 hours to 16 hours per week. This reduction resulted from AWG designating Ms. Morlan, an AWG employee, to work 40 hours per week as an EMT/Patrol Officer. AWG then needed someone to backfill Ms. Morlan's desk job.

A reasonable jury could find that AWG's adjustments made the duties of an Asset Protection Agent more flexible. So CMKA could have assigned plaintiff to work only Desk Officer shifts thereby accommodating plaintiff's apparent inability to perform the essential functions as an EMT/Patrol Officer. Indeed, CMKA had taken this step shortly after plaintiff's June 25, 2014 seizure. So, such an adjustment could constitute a reasonable accommodation.

CMKA argues that plaintiff also was unable to perform the essential functions of the Desk Officer position, even with an accommodation. But on this record, the court cannot determine the essential functions of this job as a matter of law. So to address accommodations at

summary judgment, the court assumes working alone and conducting foot patrols were essential functions of a Desk Officer and plaintiff was unable to perform those functions without an accommodation.

Plaintiff contends that moving him to the day shift would have accommodated his apparent inability to work alone or conduct foot patrols. AWG makes a conclusory statement in its statement of purportedly undisputed facts that an AWG employee worked the entire day shift and had different duties. CMKA argues that this fact means plaintiff could not have worked this shift. But AWG's conclusory statement and CMKA's argument fail to establish uncontroverted facts that could have assigned plaintiff to a shift during daytime hours. On the summary judgment record, a reasonable jury could find that, after an interactive process, CMKA, with AWG's assistance, could have made this accommodation. *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999) ("The interactive process is typically an essential component of the process by which a reasonable accommodation can be determined. The interactive process includes good-faith communications between the employer and employee." (footnote omitted)).[21]

Also, a reasonable jury could find that CMKA could have accommodated plaintiff by acquiring equipment, thus allowing him to perform the essential functions of a Desk Officer during an overnight shift. Plaintiff suggests a camera and/or panic button mounted at the front desk. A reasonable jury could find that this equipment could have allowed the IT employees to monitor plaintiff while he was working at the front desk. Also, Desk Officers were supposed to conduct foot patrols when an IT employee relieved them. The IT employee stationed at the front

---

[21]     When analyzing another argument, the court reviewed AWG's Assignment Schedule (Doc. 198-14). This schedule suggests that CMKA assigned plaintiff to some daytime Desk Officer shifts after his June 25, 2014 seizure. For this reason, a reasonable jury could find that plaintiff's continued assignment to daytime shifts was a reasonable accommodation.

desk while plaintiff conducted foot patrols could have monitored his movements on closed-circuit televisions.  These options would have accommodated plaintiff's inability to work alone and conduct foot patrols.

CMKA contends that such options do not eliminate the risk to plaintiff.  "An individual is not qualified for a job if there is a genuine, substantial risk that he or she could be injured or injure others, and the employer cannot modify the job to eliminate the risk."  *Spradley v. Custom Campers, Inc.*, 68 F. Supp. 2d 1225, 1233 (D. Kan. 1999).  In *Spradley*, our court found that an employee with a seizure disorder was not qualified because, in part, when the employee had a seizure at work, he was near an industrial trash compactor that could have injured or killed him if he had fallen in it.  *Id.*

CMKA analogizes this holding to the "direct threat" affirmative defense available to employers under the ADA.  42 U.S.C. § 12113(b); *see* 29 C.F.R. § 1630.2(r) ("Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation.").  Here, CMKA argues, the burden is on plaintiff to demonstrate that he can perform the essential job functions without endangering himself.  *See Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007) ("[W]here the essential job duties necessarily implicate the safety of others, then the burden may be on the plaintiff to show that she can perform those functions without endangering others." (citations omitted)).  Although the "direct threat" affirmative defense does not apply here, CMKA argues that the factors[22] it considers demonstrate that plaintiff cannot meet this burden.  The court

---

[22]    To determine whether an individual would pose a direct threat, the factors to be considered include:

(1) The duration of the risk;
(2) The nature and severity of the potential harm;
(3) The likelihood that the potential harm will occur; and

declines to analyze the factors and, instead, focuses on the term's definition: "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or *reduced* by reasonable accommodation." 29 C.F.R. § 1630.2(r) (emphasis added).

CMKA argues that the risk of substantial harm to plaintiff cannot be eliminated, so he is not qualified. The court disagrees. The definition of this term does not require the risk's elimination. It merely requires a reduction in the risk. And the proposed equipment—a camera and/or panic button—could significantly reduce the risk to plaintiff. CMKA expresses concern about plaintiff's risk of choking, aspirating, and dying of Sudden Death of Epilepsy ("SUDEP"). Those are risks that plaintiff would face if he had a seizure anywhere while alone. But cameras and panic buttons could have lowered plaintiff's risk of choking, aspirating, and SUDEP to a point that a reasonable jury could find that they no longer presented a direct threat to him.

*Spradley* instructs the court to view potential risks of harm to plaintiff and others in the workplace. In *Spradley*, an industrial trash compactor posed a threat to that plaintiff that he would not face in everyday life. Choking, aspiration, and dying of SUDEP are all risks plaintiff would face at home while alone. But with the suggested devices, IT employees could respond and assist. Their ability to respond would lower the risk of direct threat to plaintiff. In practice, plaintiff, with these accommodations, would be at a lower risk of choking, aspirating, or dying of SUDEP while at work than he would be at home alone. For these reasons, a reasonable jury could find that the suggested accommodations could have reduced the direct threat to plaintiff's health. By reducing that threat, the jury also could find that plaintiff was otherwise qualified.

---

(4) The imminence of the potential harm.

29 C.F.R. § 1630.2

The court thus concludes there is a genuine issue whether plaintiff was qualified to perform the Asset Protection Agent position with reasonable accommodation.

**4.     A Genuine Dispute Exists Whether Plaintiff Suffered Discrimination because of His Disability**

The last element of the prima facie case of ADA discrimination is discrimination because of a disability.  "[T]o demonstrate 'discrimination,' a plaintiff generally must show that he has suffered an 'adverse employment action because of the disability.'"  *E.E.O.C. v. C.R. Eng., Inc.*, 644 F.3d 1028, 1038 (10th Cir. 2011) (quoting *Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001)) (other citations omitted).  An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  A court determines whether an employment action is adverse by using a "case-by-case approach, examining the unique factors relevant to the situation at hand."  *McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006) (citation omitted).

Plaintiff alleges that he was discriminated against in four ways.  They are:  (1) his removal from EMT training; (2) his removal from AWG; (3) CMKA's failure to reassign him; and (4) termination of his employment by CMKA.

**a.     Removal from EMT Training**

A reasonable jury could find that plaintiff's removal from EMT training was an adverse employment action.  Although removal from EMT training was not a hiring or firing, it was more than a "petty slight[], minor annoyance[], and simple lack of good manners."  *Roecker*, 2017 WL 445504 at *11.

The court must determine if "a reasonable employee would have found [the action] materially adverse" while also "examining the unique factors relevant to the situation at hand." *McGowan*, 472 F.3d at 742. Here, it is uncontroverted that plaintiff applied for, and was hired for a position using EMT skills. It also is uncontroverted that plaintiff wanted to use his EMT skills. When AWG postponed his training, he asked CMKA about other positions that would allow him to use his EMT skills. He voiced his desire to use those skills several times to CMKA. A reasonable jury could find these were the actions that a reasonable employee who applied for an EMT position would undertake.

Although both Desk Officer and EMT/Patrol Officer duties were contained under the umbrella of Asset Protection Agent duties, the duties of the two positions were significantly different. Plaintiff started his assignment to AWG by performing only Desk Officer duties. Then, on June 25, 2014, his duties were going to change to include EMT/Patrol Officer duties. But following his seizure that same day, he once again performed Desk Officer duties only. This is similar to a reassignment with significantly different responsibilities, which the Supreme Court has recognized as an adverse employment action. *See Burlington Indus., Inc.*, 524 U.S. at 761.

A reasonable jury could find that plaintiff's removal from EMT training was an adverse employment action. And it is uncontroverted that CMKA removed plaintiff from EMT training because of his seizure disorder. Accordingly, a genuine issue of material fact exists whether plaintiff suffered an adverse employment action because of his disability.

### b.    Removal from AWG

CMKA does not dispute that plaintiff's removal from AWG was adverse. Instead, it argues that there is insufficient temporal proximity to plaintiff's seizure to support a reasonable finding that his removal from AWG resulted from his seizure disorder. *See Anderson v. Coors*

*Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (finding temporal proximity to be a key element of showing causation). Our Circuit has recognized that "unless the [adverse action] is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *Id.* (emphasis in original). The Tenth Circuit also has held that a one and one-half month period may, by itself, establish causation. *Id.* But, a three-month period, standing alone, is insufficient to establish causation. *Id.* With an interval between one and one-half months and three months, "the adverse action's timing ceases to be sufficient, standing alone, to establish the requisite causal inference is less than pellucid." *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013)

Here, plaintiff's seizure occurred on June 25, 2014. CMKA removed him from AWG on August 21, 2014—about two months later. So plaintiff likely could not rely solely on temporal proximity. But plaintiff doesn't rely on just timing. Instead, he argues that Mr. Harper's August 19, 2014 email to Erin Neuberger at Cobalt Astra provides some additional evidence of discrimination. Plaintiff contends that Mr. Harper's sentence in that message—"I am letting [plaintiff] go Friday, this is *the guy who had the seizure* and his doctor cleared him . . ."—suggests a causal link between his seizure disorder and his removal from AWG. Doc. 180-48 (emphasis added).

The parties disagree about the import of Mr. Harper's sentence. CMKA argues that Mr. Harper used this phrase to describe plaintiff in a way that would jog Ms. Neuberger's memory. Plaintiff argues that this sentence reveals an underlying narrative that links plaintiff's removal to his disability. The court concludes that a reasonable jury could accredit either interpretation. In sum, this evidence combined with an intermediate level of temporal proximity precludes summary judgment on this issue.

91

### c.    CMKA's Failure to Reassign Plaintiff

CMKA argues that its failure to reassign plaintiff is not an adverse action because it hired plaintiff for an assignment at AWG.  CMKA notes that plaintiff was an on-call employee so CMKA could provide him with assignments only as they were available.  And because the opening at Aberdeen never materialized, no alternative assignment was available for plaintiff.

CMKA's argument misses the mark.  An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc.*, 524 U.S. at 761.  By failing to reassign plaintiff, CMKA stopped giving plaintiff hours.  This "caus[ed] a significant change in benefits" that was like CMKA firing plaintiff.  *Id.*  A reasonable jury could find that CMKA's failure to reassign plaintiff was an adverse employment action.  Moreover, a reasonable jury also could find that CMKA's failure to reassign plaintiff was causally connected to his disability for two reasons.  First, CMKA's failure to reassign plaintiff occurred after Mr. Harper's August 19, 2014 email that provided some evidence of discrimination, as discussed above.  Two, this adverse action had a sufficient temporal proximity to plaintiff's seizure.  *See Anderson*, 181 F.3d at 1179.  For these reasons, a genuine dispute exists whether CMKA's failure to reassign plaintiff was an adverse action that was causally connected to his disability.

### d.    Alleged Termination from CMKA

Finally, CMKA argues that it did not terminate plaintiff so there was no adverse action.  There is no dispute that termination is an adverse action—the only question is whether CMKA terminated plaintiff's employment.

The facts circulating around plaintiff's departure from CMKA are murky. Ms. Threadgill called plaintiff about bringing in his uniforms and picking up his final check. During the call with plaintiff, Mr. Harper interrupted her, so she retracted her request and instead, relayed a message from Mr. Harper that he still was trying to find plaintiff work. Then, Mr. Harper contacted plaintiff personally to tell him he still was considered a CMKA employee, they just didn't have any current assignments to give him.

Later, plaintiff brought his uniforms to Ms. Threadgill and picked up his last check. She didn't ask him why he did so, and plaintiff didn't volunteer the information. The summary judgment record contains facts suggesting that plaintiff assumed he was fired. And likewise, it contains facts suggesting that Mr. Harper and Ms. Threadgill assumed plaintiff had quit. But neither side of this exchange confirmed the other side's intentions.

When viewing this sequence of events in the light most favorable to plaintiff, the court finds a genuine issue of material fact exists whether CMKA terminated plaintiff. Although Ms. Threadgill retracted her request for plaintiff's uniforms, Mr. Harper later told him they didn't have any assignments for him. And when plaintiff brought his uniforms to Ms. Threadgill, she didn't reiterate that there was no need for plaintiff to turn in his uniforms or pick up his last check. From this series of events, a reasonable jury could find that CMKA terminated plaintiff's employment.

Neither party offers an explicit argument whether the alleged termination was linked causally to plaintiff's seizure disorder. But on this record, the court concludes that a reasonable jury could find that it was causally linked to plaintiff's disability for reasons already explained.[23]

_____

[23] The facts in the summary judgment record do not establish when Ms. Threadgill called plaintiff or when he turned in his uniforms. The lapse of time after August 21, 2014, is described as "several weeks," so the court infers that less than a month passed between his removal from AWG and his alleged

93

In sum, plaintiff has established a genuine issue of fact about each element of the prima

facie case of ADA discrimination.  This conclusion shifts the burden to CMKA.  It must show

legitimate non-discriminatory reasons for the adverse employment actions.  *Dewitt*, 845 F.3d at

1307.  The next section addresses this step of the analysis.

**5.     CMKA Shows Legitimate Non-Discriminatory Reasons for the Adverse Employment Actions**

To rebut the presumption of discrimination raised by plaintiff's prima facie case, CMKA

must articulate a legitimate non-discriminatory reason for the adverse employment actions.

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  CMKA "need not persuade

the court that it was actually motivated by the proffered reasons . . . . It is sufficient if [CMKA's]

evidence raises a genuine issue of fact as to whether it discriminated against [] plaintiff."  *Id.*

"To accomplish this, [CMKA] must clearly set forth, through the introduction of admissible

evidence, the reasons for the [adverse action]."  *Id.*  CMKA's explanation of its legitimate

reasons must be "clear and reasonably specific" and thereby present plaintiff with "a full and fair

opportunity to demonstrate pretext."  *Id.* at 255–56, 258.

Plaintiff concedes that CMKA has articulated legitimate non-discriminatory reasons for

his removal from EMT training, his removal from AWG, and for CMKA's failure to reassign

him.  But, he disputes that CMKA has produced a clear and reasonably specific reason for his

alleged termination from CMKA.

In response, CMKA asserts that it "had more than enough legitimate reasons to make

such a decision—Plaintiff's performance problems were serious enough to justify not only his

removal from the AWG site (the position for which he was specifically hired), but also for his

---

termination.  This inference makes the temporal proximity less than three months and within the Tenth
Circuit's limit for an inference of temporal proximity.  *See Anderson*, 181 F.3d at 1179.

termination from employment at CMKA." Doc. 180 at 68. CMKA also asserts: "Plaintiff was removed from the AWG position because CMKA's client, AWG, was unhappy with Plaintiff's performance and wanted Plaintiff removed due to legitimate and significant performance reasons. Plaintiff had admitted performance problems throughout his employment with CMKA. Plaintiff was removed due to performance problems." Doc. 180 at 67 (citations omitted).

CMKA argues that "performance problems" are a legitimate non-discriminatory reason for both plaintiff's removal from AWG and his termination from CMKA. The court finds no reason to treat "performance problems" as a clear and reasonably specific reason for plaintiff's removal from AWG but not his termination from CMKA. The court thus concludes that CMKA has produced a legitimate non-discriminatory explanation for this adverse action.

Having concluded that CMKA articulated a legitimate, non-discriminatory reason for each of the four adverse actions, the burden shifts back to plaintiff. He must now show there is a genuine issue of material fact whether CMKA's "proffered legitimate reason is genuine or pretextual." *Dewitt*, 845 F.3d at 1307. The next section addresses that issue.

### 6.     A Genuine Dispute Exists Whether CMKA's Proffered Reasons were Pretextual

"A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007). "In establishing pretext, an employee can show the employer's proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007). "Typically, a plaintiff may show pretext in one of three ways: (1) with evidence that defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the

action taken by the defendant under the circumstances; or (3) with evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004) (internal quotation marks, corrections, and citation omitted). But, "[e]vidence of pretext may also take a variety of other forms," so plaintiff is not "forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007) (internal quotation marks, corrections, and citation omitted).

First, plaintiff never argues that the reasons given by CMKA for his removal from EMT training were pretextual. So he has failed to raise a genuine dispute about that action, and the court thus grants summary judgment against plaintiff's ADA discrimination claim based on his removal from EMT training.

Plaintiff's arguments about CMKA's reasons for removing him from AWG, failing to reassign him, and terminating his employment remain. The court addresses them now. Plaintiff argues that a reasonably jury could find CMKA's articulated reasons for these actions are pretextual for three reasons: (1) Mr. Harper's stated reason for removing plaintiff from AWG were false; (2) CMKA's actions were contradictory because they tried to find plaintiff another position; and (3) plaintiff was treated differently than other similarly-situated CMKA and AWG employees. [24]

---

[24]    The court does not address the portion of plaintiff's argument relying on Document 198-15. Like AWG's objection to plaintiff's use of Document 200-16 (CMKA Termination Report), *see* note 2 above, CMKA objects to plaintiff's use of Document 198-15 (the same Termination Report) to support a purported summary judgment fact. Doc. 209 at 126–27. Again, plaintiff fails to cite to any deposition transcript or affidavit purporting to make this report a part of the summary judgment record. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) ("[Summary judgment facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992))). The court concludes that it

First, it is uncontroverted that Mr. Harper provided plaintiff a false reason for his removal from AWG.  During a phone call on August 21, 2014, Mr. Harper told plaintiff that he was being removed from the AWG assignment because the contract had changed.  Mr. Harper also told plaintiff that AWG was reducing the number of security personnel.  CMKA concedes that this reason was false.  CMKA now asserts its real, nondiscriminatory reason for removing plaintiff from AWG was his various performance issues culminating in plaintiff's failure to conduct floor checks properly.  Mr. Harper explains that he gave plaintiff a false reason because he was trying to be nice to him.

CMKA argues, first, that Mr. Harper believed plaintiff was going to continue to work at CMKA so he was trying to be nice to him when he gave a softer reason for the end of his assignment at AWG.  Then, CMKA tried to explain Mr. Harper's false reason as a poor choice of words.  Finally, employing elaborate wordsmithing, CMKA concludes that the reason Mr. Harper gave plaintiff actually was true because AWG could request plaintiff's removal under the Agreement.  So, if Mr. Harper had said that plaintiff was removed because "AWG had requested changes *pursuant* to their contract," he would have provided a true reason, not a false one.  Doc. 209 at 149 (emphasis in original).

None of these arguments persuade the court to grant summary judgment on the pretext issue.  The summary judgment record contains evidence that Mr. Harper did not hesitate to reprimand plaintiff for lesser performance shortcomings—*e.g.*, dress code issues.  So a jury rationally could reject CMKA's explanation for Mr. Harper's untrue statement to plaintiff on August 21, 2014.

---

cannot properly consider Document 198-15 because plaintiff has failed to make it part of the summary judgment record.

In sum, because CMKA has given "inconsistent" and "contradictory" reasons for ending

plaintiff's assignment to AWG, *Piercy*, 480 F.3d at 1200, CMKA's "proffered explanation" is

not "unworthy of credence." *Zamora*, 478 F.3d at 1166. Likewise, any reasons CMKA gave for

adverse actions after plaintiff's removal from AWG—failing to reassign plaintiff and CMKA's

alleged termination of plaintiff's employment—are tainted and also unworthy of credence.

Namely, CMKA told plaintiff there were no available positions where it could reassign him and

this absence of available positions caused plaintiff's alleged termination from employment with

CMKA. The genuine dispute about pretext resulting from Mr. Harper's contradictory reason for

removing plaintiff from assignment to AWG overshadows these non-discriminatory explanations

as well. So a reasonable jury could conclude they, too, were pretextual.

Plaintiff thus has discharged his summary judgment burden. The court concludes that a

genuine issue of material fact exists and it thus denies CMKA's motion for summary judgment

against plaintiff's discrimination claim under the ADA.[25]

### 7.    A Reasonable Jury Could Conclude that CMKA Retaliated Against Plaintiff

This leaves plaintiff's retaliation claim. To establish a prima facie case of retaliation,

plaintiff must show: "(1) he engaged in a protected activity; (2) he was subjected to an adverse

employment action subsequent to or contemporaneous with the protected activity; and (3) there

was a causal connection between the protected activity and the adverse employment action."

*Foster*, 830 F.3d at 1187 (internal quotation marks, correction, and citation omitted).

A plaintiff may engage in protected activity in several ways. One way is to challenge an

employment practice that he reasonably believed was unlawful. *See Hinds v. Sprint/United*

---

[25]    Given its conclusion based on CMKA's inconsistent statements, the court does not reach plaintiff's
arguments about disparate treatment among similarly situated employees.

*Mgmt. Co.*, 523 F.3d 1187, 1201 (10th Cir. 2008); *see also Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015).  No magic words are required, but to qualify as such a challenge, the employee must convey to the employer his concern that the employer has engaged in an unlawful practice.  *Hinds*, 523 F.3d at 1203.  Another means to engage in protected activity is to request an accommodation.  *Foster*, 830 F.3d at 1187.  Again, no magic words are required, but the employee must make clear that he seeks assistance for his disability.  *Id.* at 1188.

Plaintiff contends that he both challenged an employment practice and requested an accommodation on two different occasions.  The first such challenge is plaintiff's conversation with Mr. Harper a few days after his June 25, 2014 seizure.  Plaintiff asked, "I'm not going to lose my job because of this?," and "I'm not going to be impacted by this in anyway?" (plaintiff explained that "this" referred to his medical condition).  Doc. 198-4 at 12 (Crumpley Dep. 74:10–17).  The second predicate challenge relies on an email exchange on August 21, 2014—shortly after Mr. Harper removed plaintiff from AWG.  Plaintiff asked Mr. Harper, "Just so we're clear, this has nothing to do with my medical history right?"  Doc. 180-51 at 1.

The first exchange—"I'm not going to lose my job because of this?" and "I'm not going to be impacted by this in anyway?"—cannot qualify as a challenge of an illegal employment practice.  As of June 25, no illegal practice existed for plaintiff to challenge.  And if plaintiff is trying to treat these statements as a preemptive challenge to employment practices he perceived as possible, he provides no legal support for such a theory.

Likewise, no reasonable jury could find that plaintiff's questions after his June 25 seizure requested an accommodation.  An employee must clearly request assistance for his disability to qualify as a protected activity.  *Foster*, 830 F.3d at 1188.  A request is adequate if it is

"sufficiently direct and specific, giving notice that [the employee] needs a special accommodation." *Id.* (quoting *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 23 (1st Cir. 2004)) (brackets in original) (other citation omitted).  Plaintiff's questions shortly after June 25 make no request and give no notice that plaintiff needed special accommodation.  No reasonable jury could find that plaintiff engaged in protected activity when he had asked these questions of Mr. Harper.

Plaintiff also argues that his August 21, 2014 email was protected activity.  The question he asked then—"Just so we're clear, this has nothing to do with my medical history right?"— also does not make a request or give notice that plaintiff needed a special accommodation.  It cannot qualify as protected activity because it requests no accommodation.

But this question may have challenged an employment practice.  The legal standard requires no magic words.  Instead, the employee merely must convey his concern that the employer has engaged in an unlawful practice.  *Hinds*, 523 F.3d at 1203.  In *Hinds*, our Circuit provided some insight into this standard.  523 F.3d at 1202–03.  Analyzing whether several emails were protected activity under the Age Discrimination in Employment Act, the Circuit distinguished the emails based on whether they mentioned or alluded to age or age discrimination.  The Circuit summarily dismissed the claims based on emails that did not mention or allude to age or age discrimination.

Here, plaintiff's August 21, 2014 email makes the first cut because it mentions plaintiff's medical history—his disability.  Also, a reasonable jury could read the question as expressing a concern about disability discrimination.

But it does concern the court that plaintiff's email asks a question.  Some aspects of Supreme Court authority imply that a question—if it really asks a question—can supply the

predicate for a retaliation claim.  On one hand, "[w]hen an employee communicates to [his]

employer a belief that the employer has engaged in . . . a form of employment discrimination,

that communication virtually always constitutes the employee's opposition to the

activity."  *Crawford v. Metro. Gov't of Nashville and Davidson Cty., Tenn.*, 555 U.S. 271, 276

(2009) (internal quotation marks and citations omitted).  The form of that communication "can

range from filing formal charges to voicing informal complaints to superiors."  *Hertz v. Luzenac

Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004) (citation omitted).

Yet other courts have concluded that a question that really is a question cannot qualify as

a "challenge" or "opposition" to an unlawful action.  *See Schoonover v. Schneider Nat. Carriers,

Inc.*, 492 F. Supp. 2d 1103, 1153–54 (S.D. Iowa 2007) (holding that employee's inquiries about

whether her equipment and work assignments were based on her gender did not constitute

opposition to an unlawful employment practice and thus was not protected activity).  In

*Schoonover*, the court granted summary judgment against plaintiff's retaliation claim and

reasoned that an employee's decision to "*inquire* belies any notion that she had already formed a

belief that an unlawful employment practice was occurring."  *Id.* at 1154 (emphasis in original).

As the summary judgment order explained, "[a] query is not an accusation, the act of asking is

distinct from the act of expostulating, and information gathering must precede a critique."  *Id.*

While the court agrees with the crux of *Schoonover*—a true inquiry could not provide the

requisite predicate for a retaliation claim—the record here, considered as a whole, makes the

issue inappropriate for summary judgment.  While it is an exceedingly close call, the court rules

that a reasonable jury could find plaintiff's explicit reference to his seizure disorder amounted to

a challenge to an employment practice he reasonably perceived as unlawful.  If a jury accredited

the view of plaintiff's words, it would be a reasonable inference. And under the governing law, it would qualify as protected activity.

That conclusion moves the analysis to the next step: Plaintiff must show he suffered an adverse employment action after his protected activity. *Foster*, 830 F.3d at 1187. The court already has determined that a reasonable jury could find that plaintiff suffered two adverse actions following his August 21, 2014 email—CMKA's failure to reassign him and CMKA's termination of his employment. So the court turns to the final element of plaintiff's prima facie case of ADA retaliation—"a causal connection between the protected activity and [these] adverse employment action[s]." *Id.*

Like causal connection on an ADA discrimination claim, temporal proximity, alone, may satisfy this final element of the prima facie case of retaliation. *See Annett v. Univ. of Kansas*, 371 F.3d 1233, 1240 (10th Cir. 2004) (first citing *Ramirez v. Oklahoma Dep't. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (concluding that a one and one-half month period between protected activity and adverse action may establish causation), *overruled on other grounds by Ellis v. University of Kansas Medical Center*, 163 F.3d 1186, 1194–97 (10th Cir. 1998); then citing *Anderson*, 181 F.3d at 1179 (assuming that temporal proximity of two months and one week is sufficient to support a prima facie case of retaliation)).

Here, the court is unable to discern the exact interval between plaintiff's August 21, 2014 email asking—"Just so we're clear, this has nothing to do with my medical history right?"—and when plaintiff turned in his uniforms and pick up his final check (his alleged termination). The only metric of time contained in the summary judgment facts is that "several weeks" elapsed between that email and the phone call where Ms. Threadgill, at first, told plaintiff to turn in his uniform and pick up his final check. Then, some period not reflected in the summary judgment

record elapsed when Mr. Harper told plaintiff he didn't have any assignments for him and ultimately, plaintiff turned in his uniforms and retrieved his final check.

Despite this uncertainty, a reasonable jury could infer that the period at issue here is no greater than the period allowed by *Anderson*—two months and one week—and likely within the period allowed by *Ramirez*—one and one-half months.  Here's how the court reached that conclusion.

Plaintiff sent the email to Mr. Harper on August 21, 2014.  Six weeks and five days later, on October 7, 2014, CMKA's Mr. Smith sent an email expressing his opinion why plaintiff was removed from AWG.  Although it is unclear what prompted the email, a jury reasonably could find that Mr. Smith was responding to an inquiry about plaintiff's alleged termination from CMKA.  Mr. Smith starts with:  "Did you get the story from Jeff [Harper] on this?"  Doc. 65-11.  Then, he explains his opinion and ends by saying, "What's next?"  *Id.*  The overall content of the email suggests Mr. Smith was responding to an inquiry.  In that case, Mr. Smith would have sent the email after plaintiff's alleged termination.  And so, CMKA's failure to reassign plaintiff and plaintiff's alleged termination from CMKA seem to have occurred before October 7—making these adverse employment actions temporally proximate to plaintiff's activity.  Plaintiff thus has adduced admissible evidence of a causal connection between his protected activity and the adverse employment actions.

Plaintiff has established the capacity to present admissible evidence on every element of his prima facie case of ADA retaliation.  The court thus denies CMKA's summary judgment motion on this claim.

8.     **Plaintiff is not Entitled to Compensatory or Punitive Damages on His ADA Retaliation Claim**

The final issue CMKA raises is whether plaintiff is entitled to compensatory and punitive damages on his ADA retaliation claim.  In support of its argument that plaintiff cannot recover such damages, CMKA relies on *Boe v. AlliedSignal Inc.*, 131 F. Supp. 2d 1197 (D. Kan. 2001). In *Boe*, our court conducted an in-depth analysis into this very issue.  131 F. Supp. 2d at 1202–03.  Judge VanBebber examined the four subchapters of the ADA to determine that § 12117 adopts the remedies in Title VII of the Civil Rights Act of 1964.  After careful review of the Civil Rights Act of 1964 and 1991, the court determined that the statutory language provided compensatory and punitive damages for ADA discrimination claims but not for ADA retaliation claims.  The court concluded that plaintiff is "entitled only to equitable relief on his ADA employment retaliation claim and is not entitled to compensatory or punitive damages."  *Id.* at 1203.

Since *Boe*, our court has addressed this issue twice more.  *See Umholtz v. Kansas, Dep't of Soc. & Rehab. Servs.*, 926 F. Supp. 2d 1222 (D. Kan. 2013), *aff'd sub nom. Levy v. Kansas Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164 (10th Cir. 2015); *Sink v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 1085, 1100–01 (D. Kan. 2001).  In both decisions, our court held that compensatory and punitive damages are not available on ADA retaliation claims.

*Umholtz* noted that the Seventh and Ninth Circuits already had held the same.  926 F. Supp. 2d at 1230 (citing *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1264–70 (9th Cir. 2009); *Kramer v. Banc of America Securities, LLC*, 355 F.3d 961, 964–66 (7th Cir. 2004) *cert. denied*, 542 U.S. 932 (2004)).  Also, the court acknowledged that the Tenth Circuit affirmed a jury verdict where punitive damages were awarded on an ADA retaliation claim, but the Circuit did not address the threshold question whether the law permitted a plaintiff to recover such

104

damages, only whether the evidence supported such an award. *Id.* (citing *E.E.O.C. v. Wal–Mart Stores, Inc.*, 187 F.3d 1241, 1246 (10th Cir.1999)).

Plaintiff asserts that *Wal-Mart Stores, Inc.* is binding precedent on the court. Doc. 197 at 113. But as *Umholtz* acknowledged, the Circuit did not address the issue whether the law permitted a plaintiff to recover such damages. Since *Umholtz*, no Circuit Court has addressed this issue. Neither has our court.

In sum, the Seventh and Ninth Circuits and our court have held that compensatory and punitive damages are not available on ADA retaliation claims. And our Circuit has not addressed the issue squarely. Accordingly, the court concludes plaintiff is not entitled to compensatory or punitive damages on his ADA retaliation claim.

### III.    Conclusion

The court grants in part plaintiff's Motion to Exclude Certain Opinion Testimony of Dr. Kaplan and Dr. Seely and denies it in part. These neurologists properly may give testimony based on their personal knowledge of the examination, diagnosis, and treatment of plaintiff. But they may not opine about plaintiff's employability, whether he can legally drive, or what he should disclose to his employers.

The court grants defendant AWG summary judgment against all plaintiff's claims because no reasonable jury could find that AWG was plaintiff's employer. The court also grants plaintiff summary judgment on the issue whether his seizure disorder amounts to a disability under the ADA.

Finally, the court grants CMKA summary judgment against plaintiff's ADA discrimination claim based on his removal from the EMT training program. But it denies summary judgment against plaintiff's ADA discrimination claim based on his removal from

AWG, CMKA's failure to reassign plaintiff, and its termination of his employment. The court also denies CMKA summary judgment against plaintiff's ADA retaliation claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's Motion for Partial Summary Judgment (Doc. 175) is granted.

**IT IS FURTHER ORDERED THAT** plaintiff's Motion to Exclude Certain Opinion Testimony of Dr. Jeffery Kaplan and Dr. Michael Seeley (Doc. 177) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** defendant CMKA's Motion for Summary Judgment (Doc. 179) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** defendant AWG's Motion for Summary Judgment (Doc. 181) is granted.

**IT IS SO ORDERED.**

**Dated this 23rd day of April, 2018, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**